# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BRUCE WASHINGTON, Individually and GREGORY LANE, Individually<br><br>                    Plaintiffs,<br><br>        v.<br><br>RANDY SMITH, in his official capacity as SHERIFF OF ST. TAMMANY PARISH, LOUISIANA; JACKSON BRIDEL in his individual capacity; ALEXANDER THOMAS in his individual capacity; SHAUN WOOD in his individual capacity; and JOHN DOE EMPLOYEES OF THE ST. TAMMANY PARISH SHERIFF'S OFFICE in their individual capacities,<br><br>                    Defendants. | CIVIL ACTION NO.: 2:22-cv-632<br><br>JUDGE:<br><br>MAGISTRATE JUDGE:<br><br><br>**COMPLAINT** |

## <u>COMPLAINT AND JURY DEMAND</u>

Plaintiffs Bruce Washington and Gregory Lane by and through the undersigned counsel, bring claims against Defendants Randy Smith, in his official capacity as Sheriff of the St. Tammany Parish Sheriff's Office (hereinafter "STPSO"), and STPSO Deputies[1] Jackson Bridel, Alexander Thomas, and Shaun Wood in their individual capacities (together, the "Individual Defendants"); and John Doe employees of the STPSO in their individual capacities (together, the "Doe Defendants"), respectfully allege as follows:

---

[1] As there is no legal difference between "deputies" and "officers," for the purpose of describing the allegations and causes of action contained herein, the terms will be used interchangeably.

## INTRODUCTION

1.     At its heart, this case is about the force that motivates all enumerated rights in the United States Constitution: the preservation of human dignity.  Indeed, Justice Potter Stewart said that "the essential dignity and worth of every human being" is "a concept at the root of any decent system of ordered liberty."  *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1996) (Stewart, J., concurring). Dignity is a fundamental constitutional value that the Supreme Court evokes time and time again to prevent the stigmatic injury that results from state-sanctioned prejudice.[2]  In particular, the Court has protected dignity in every step of the criminal justice system by demanding a minimal level of treatment that federal and state governments must provide to all human beings, including those suspected of committing crimes.[3]

2.     Despite vowing to serve and protect all members of the St. Tammany community, STPSO's pervasive culture of racism and prejudice against Black Americans is well documented. In 2010, the STPSO's then-Sheriff, Sheriff Rodney "Jack" Strain, ranted to a local news reporter on camera, "If you're gonna walk the streets of St. Tammany Parish with dreadlocks and chee wee hairstyles, then you can expect to be getting a visit from a sheriff's deputy…you can guarantee that things that you got away with in the city will not be tolerated in this parish."  Years later, in 2014, several high-ranking STPSO detectives were exposed for exchanging racist and offensive emails amongst each other, including referring to Black individuals as "monkey[s]" and "animals." These are not the documented prejudices of low-level STPSO employees or even the views of one outlier deputy, but rather a consistent message echoing throughout the top echelon of STPSO

---

[2]     *See, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 681 (2015) (The Court said of the plaintiffs: "They ask for equal dignity in the eyes of the law.  The Constitution grants them that right.")

[3]     *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 613-14 (1989) (viewing arbitrary searches and seizures as violating the dignity of those the government targets).

leadership and amounting to an STPSO-wide policy of racially-motivated targeting of Black individuals.  This has resulted in shockingly disparate treatment of Black individuals by law enforcement such that in Louisiana, Black individuals are 3.2 times more likely to be arrested for marijuana possession than white individuals, despite evidence that black people and white people use marijuana at similar rates.  State-wide, Black people constitute 33% of state residents, but 67% of people in prison and 52% of people in jail.

3.     The Plaintiffs' claims arise out of a pretexual and unlawful seizure to which Mr. Washington and his cousin Mr. Lane were subject during a traffic stop.  The stop lasted about 20 minutes, which may at first seem ordinary.  However, the incident was not ordinary at all.  In connection with the stop, the Individual Defendants, among other things: (a) surveilled Mr. Washington before the stop as he lawfully bought gas for his car at a nearby Exxon gas station,; (b) tailed the Plaintiffs, who were not speeding or otherwise endangering themselves or the public, for over a mile and ignored a white van with no taillights speeding past them; (c) told the Plaintiffs that they had been watching Mr. Washington "the whole time" since well before they stopped him; (d) in response to Mr. Lane (the passenger) requesting to call his wife and lawyer, ordered Mr. Lane out of the car, grabbed Mr. Lane's elbow, and patted him down because Mr. Lane was acting "a little weird" for wanting to call his lawyer; (e) in response to Mr. Washington saying he knew his rights under the law, threatened Mr. Washington that they were going to make the traffic stop "go a different way than it has to be;" (f) frisked Mr. Washington for weapons without his consent despite Mr. Washington confirming he was not armed and having no reason to believe he was dangerous; and (g) delayed the drafting of the traffic ticket multiple times to attempt to justify the extension of the stop (including running a criminal record check on Mr. Lane) and yelling at Mr.

Washington for wanting to retrieve paperwork showing an alleged outstanding traffic-related warrant was resolved.

4.      The Plaintiffs' mistreatment continued after the traffic stop.  Indeed, when they tried to report the misconduct they faced during the stop, they were ridiculed.  Two days after the incident, when the Plaintiffs went from STPSO office to office, they were denigrated and humiliated by all STPSO employees encountered—just for wanting to file a complaint.  Not a single STPSO employee bothered to listen in earnest when Plaintiffs tried to tell them exactly what happened during the traffic stop.  Instead, they accused Plaintiffs of being unreasonably upset about receiving a traffic ticket, telling them to "get out of [their] office," and informing Plaintiffs that they would "never" write up one of their deputies.

5.      These demeaning experiences at the hands of Individual Defendants and Doe Defendants at multiple STPSO offices left the Plaintiffs—two adult Black men, each with grandchildren—in so much emotional distress that, now, they feel in danger whenever they leave their homes, ride in a car as either driver or passenger, or in any way find themselves near law enforcement.  Indeed, proximity to these run-of-the-mill occurrences provoke fear in each that they will again be harassed and demeaned.  Their fears stem not only from the traffic stop, but also from how they were treated thereafter.  They fear that if STPSO deputies were to harass them again, or worse, the Plaintiffs would again be disparaged and blocked by STPSO employees for attempting to exercise their right to file a complaint.

6.      The Supreme Court has said that "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California*, 384 U.S. 757, 767 (1966).  The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.  *United*

*States v. Brignoni–Ponce*, 422 U.S. 873, 878 (1975).  It is clearly established that lawful traffic stops may last no longer than necessary to effectuate their purpose.  *Rodriguez v. United States*, 575 U.S. 348, 356-57 (2015).

7.     Bruce Washington, a 53-year-old Black man and resident of Bogalusa, Louisiana, was unlawfully detained near a Smoothie King parking lot on March 13, 2021 (the "March 13, 2021 Incident" or the "Incident").  The unlawfulness of the detention was due to the prolonged nature of the stop, its pretextual basis, and the demeaning manner in which the police treated Mr. Washington during the Incident.  The stop arose from two alleged traffic offenses—both of which were subsequently dismissed.  Regardless, each alleged infraction could have been resolved merely through the swift issuance of a traffic citation.  Instead, the Individual Defendants intentionally stalled and delayed the writing of a traffic citation beyond what was reasonably necessary without any reasonable suspicion of criminal activity or threat to deputy or public safety. The Individual Defendants, under color of law, conspired to and did in fact violate Mr. Washington's constitutional rights under the Fourth Amendment of the United States Constitution and Article I, Section 5 of the Louisiana Constitution.  In doing so, they violated Mr. Washington's civil rights pursuant to 42 U.S.C. § 1983.

8.     Gregory Lane is a 47-year-old Black man and a resident of Mandeville, Louisiana.  For approximately 8 minutes, the Individual Defendants arbitrarily and unconstitutionally surpassed the clearly established boundaries of *Terry v. Ohio*, 392 U.S. 1 (1968) as applied to passengers of lawfully stopped vehicles in their excessive search and seizure of Mr. Lane.  The Supreme Court has yet to hold that an officer may, without a separate and articulable reasonable suspicion, detain a passenger of a lawfully stopped vehicle for the entire duration of the stop merely because they were riding in the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 414 n.3 (1997) (holding an officer

making a traffic stop may order passengers out of the car pending completion of the stop but explicitly rejecting Plaintiff's urging the Court to hold that an officer may forcibly detain a passenger for the entire duration of the stop because the facts did not give rise to this issue).  In any event, the corresponding right to be free from excessive search and seizure under Article 1, Section 5 of the Louisiana Constitution represents a conscious choice by the citizens of Louisiana to give "a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution." *State v. Hernandez*, 410 So. 2d 1381, 1385 (La. 1982).  The Individual Defendants, under color of law, conspired to and did in fact violate Mr. Lane's constitutional rights under the Fourth Amendment of the United States Constitution and Article I, Section 5 of the Louisiana Constitution.  In doing so, they violated Mr. Lane's civil rights pursuant to 42 U.S.C. § 1983.

9.     Without reasonable suspicion of illegal activity or risk to deputy safety, Mr. Lane was ordered by the deputies to exit Mr. Washington's vehicle.  He was subsequently frisked, denied the use of his cell phone to call his wife and lawyer despite his repeated pleas, and detained for longer than necessary.  The deputies acted under color of law in violation of Mr. Lane's constitutional rights under the Fourth Amendment of the United States Constitution and Article I, Section 5 of the Louisiana Constitution.  In doing so, they violated Mr. Lane's civil rights pursuant to 42 U.S.C. § 1983.

10.    Individual Defendants conspired to detain Mr. Washington and Mr. Lane past the time reasonably necessary to issue the traffic citation.  Neither Mr. Washington nor Mr. Lane presented any threat to the deputies or signaled any indications of illegal activity.  Indeed, STPSO records confirmed the same.

11.   There was no threat to the Individual Defendants' safety because Mr. Washington pulled his vehicle over into a brightly lit, public parking lot, the deputies outnumbered the vehicle occupants three to two and Mr. Washington and Mr. Lane were compliant and unarmed.

12.   STPSO records show that the Individual Defendants explicitly acknowledged to each other and to Mr. Lane that they had no suspicion he was engaged in criminal activity.

13.   The March 13, 2021 Incident caused Mr. Lane emotional and psychological scarring. Immediately prior to the Incident, Mr. Lane was excited to get his first haircut in months and spend time with his young grandchildren.  But the March 13, 2021 Incident robbed him of his peace and instilled a fear of traveling outside of his home.  Now, Mr. Lane does not feel safe leaving his home, riding in a car as a passenger (as he does not drive), traveling outside of Mandeville, Louisiana, or interacting with uniformed STPSO officers at his place of work because he is afraid that he will be harassed by STPSO deputies.  Mr. Lane's fear of being further harassed and unlawfully detained by STPSO deputies hinders his ability to spend time with his grandchildren, who live outside of the Mandeville area, as well as travel as necessary for work and pleasure, thus impeding his quality of life.

14.   The March 13, 2021 Incident caused Mr. Washington emotional and psychological distress.  Mr. Washington suffers from fear of being surveilled by STPSO deputies while doing mundane activities such as pumping gas or driving.  He also fears being stopped and harassed by STPSO deputies, which hinders his ability to move about freely and travel to see his family, including Mr. Lane.  He fears that in the event he suffers a future incident similar to the March 13, 2021 Incident, his complaints to authorities will again not be acknowledged or taken seriously.

15.   On or around March 15, 2021, Mr. Washington and Mr. Lane visited the STPSO office located at 701 N. Columbia St., Covington, LA 70433, and expressed their desire to file a

complaint against the Individual Defendants.  Mr. Washington and Mr. Lane were refused help by employees working for the STPSO and were accused of being unreasonably upset about receiving a traffic ticket.

16.   The Covington STPSO told Plaintiffs that they could not file complaints at the Covington office and directed Mr. Washington and Mr. Lane to the shuttered STPSO office located at 526 Girod St. Mandeville, LA 70448.  When Mr. Washington and Mr. Lane finally located the actual Mandeville STPSO at 21454 Koop Dr., Building B, Mandeville, LA 70471, they were again turned away and prevented from filing a complaint.

17.   Determined to notify the Sheriff that STPSO deputies were harassing and unlawfully detaining denizens of the Parish, Mr. Washington also called the complaint number listed on the STPSO website.  Upon information and belief, Mr. Washington spoke with a Doe Defendant at 701 N. Columbia St., Covington, LA 70433.

18.   Based on internal documents produced pursuant to a Public Records Request, Crystal Dill, a STPSO 911 Dispatch Officer notified Emile Lubrano, a supervisor, of Mr. Washington's phone call.  Lubrano subsequently instructed two other STPSO employees to return Mr. Washington's call.  Upon information and belief, no STPSO employee followed up with Mr. Washington to address his request to file a complaint.  Despite the written record of the Mr. Washington's wish to file complaint, of which at least four employees were aware, no record of it exists in the STPSO's Internal Affairs complaint log of 2021.  STPSO maintains that it has no record of any complaints whatsoever related to the March 13, 2021 Incident—even though Mr. Washington and Mr. Lane went above and beyond in pursuing appropriate channels to file said complaints of their own.

19.   The Individual Defendants and the STPSO's policies, customs or practices as created or implemented by the Parish and its employees directly caused a series of violations to Mr. Washington and Mr. Lane's Fourth Amendment rights.  The SPTSO did not provide their deputies with proper oversight as it relates to conducting and ending traffic stops or with respect to the higher protections afforded to a passenger of a lawfully stopped vehicle.  The custom of not disciplining employees who violate policies or citizens' rights, including not initiating decertification processes as it relates to any of their deputies for misconduct in the past decade, and not investigating complaints of misconduct in connection with traffic stops reflects the SPTSO policymaker, Defendant Smith's, deliberate indifference to citizens' Fourth Amendment rights— and resulted in the Individual Defendants acting with impunity.

20.   Plaintiffs seek relief for Individual Defendants' violation of their rights secured by 42 U.S.C. §§ 1983, 1988 and 2000(d), the United States Constitution, including the Fourth Amendment, and the laws of the State of Louisiana.

## JURISDICTION AND VENUE

21.   This is an action to redress the deprivation under color of statute, ordinance, regulation, custom or usage of rights, privileges and immunities secured to Mr. Washington and Mr. Lane by the Constitution and laws of the United States.  Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983, 1988, and 2000(d), the Fourth Amendment to the United States Constitution, and the laws of the State of Louisiana.

22.   Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3).

23.   The Court has supplemental jurisdiction over all other claims asserted under the laws of the State of Louisiana, pursuant to 28 U.S.C. §1367, because they arise out of the same operative facts and are so related to the federal claims that they are a part of the same case or controversy.

24.     Venue is proper in this district in accordance with 28 U.S.C. §1391(b) because both plaintiffs are residents of this district, all the Individual Defendants reside in this district, and a substantial part of the events giving rise to the claims herein arose in this district.

## PARTY PLAINTIFFS

25.     Plaintiff Bruce Washington is a 53-year-old man domiciled in the State of Louisiana within the Eastern District of Louisiana.  He is a resident of Bogalusa, Louisiana.

26.     Plaintiff Gregory Lane is a 47-year-old man domiciled in the State of Louisiana within the Eastern District of Louisiana.  He is a resident of Mandeville, Louisiana.

## PARTY DEFENDANTS

27.     Defendant Jackson Bridel is a resident of Mandeville, Louisiana, located in the Eastern District of Louisiana.  Upon information and belief, at all times pertinent and relevant to this action, Bridel was employed as a deputy by the STPSO and was acting in the course and scope of his employment and under color of law.  Bridel is made a defendant herein in his individual capacity.

28.     Defendant Alexander Thomas is a resident of Madisonville, Louisiana, located in the Eastern District of Louisiana.  Upon information and belief, at all times pertinent and relevant to this action, Thomas was employed as a deputy by the STPSO and was acting in the course and scope of his employment and under color of law.  Thomas is made a defendant herein in his individual capacity.

29.     Defendant Shaun Wood is a resident of Slidell, Louisiana, located in the Eastern District of Louisiana.  Upon information and belief, at all times pertinent and relevant to this action, Wood was employed as a deputy by the STPSO and was acting in the course and scope of his employment and under color of law.  Wood is made a defendant herein in his individual capacity.

30.     Defendant Randy Smith, in his official capacity as Sheriff of the STPSO, is responsible for the hiring, training, supervision, discipline, administration, policies, customs, practices,

operations, management and control of the STPSO and its deputies, including Individual Defendants Bridel, Thomas, and Wood.  As such, Defendant Smith was the final policy maker for the STPSO in the areas of law enforcement and the employment and supervision of STPSO deputies.  As a matter of Louisiana law, Defendant Smith is liable in his official capacity for his actions as final policy maker and is vicariously liable for the actions of Defendants Bridel, Thomas, and Wood.  Smith is made a defendant herein in his official capacity.

31.   Defendant John Doe employees of STPSO, at all relevant times, were employed by STPSO.  Mr. Washington and Mr. Lane are not aware of the true names and capacities of Doe Defendants and therefore sues Doe Defendants by such fictitious names.  On information and belief, Doe Defendants reside in St. Tammany Parish, Louisiana.  Doe Defendants are sued in their individual capacities.  Mr. Washington and Mr. Lane will amend this complaint to state the true names and capacities of Doe Defendants when such have been ascertained.

32.   Defendants are liable jointly, severally, and *in solido* for the unconstitutional and statutory misconduct set forth in this complaint.

## STATEMENT OF THE FACTS

### A.     Mr. Washington's and Mr. Lane's Impermissibly Extended Traffic Stop

33.   In the evening of March 13, 2021, Mr. Washington drove to Mr. Lane's home in Mandeville, Louisiana.  He went there to pick up Mr. Lane and take him to get his first haircut in months.

34.   Mr. Lane and Mr. Washington are cousins and were preparing to celebrate Mr. Lane's late father's birthday.

35.   Mr. Lane sat in the front passenger seat of Mr. Washington's car as Mr. Washington drove towards the barbershop.

36.    Before going to the barbershop, Mr. Washington stopped to pump gas at an Exxon gas station located at 2720 Florida Street in Mandeville, Louisiana.

37.    At the gas station, without any reasonable suspicion of criminal activity or threat to public safety, Defendants Alexander Thomas and Shaun Wood began to monitor Mr. Washington's every move from their police car, telling him during the later stop that they had been watching him "the whole time."

38.    Mr. Lane noticed Defendants Thomas and Wood monitoring Mr. Washington's movements, and told Mr. Washington as much when Mr. Washington reentered his vehicle.

39.    Upon reentering his vehicle, Mr. Washington turned on his right turn signal and exited the gas station.

40.    Upon information and belief, Defendants Thomas and Wood immediately exited the gas station to continue their surveillance of Mr. Washington from a distance.

41.    While driving, both Mr. Washington and Mr. Lane observed a white van speed past them with no taillights.  Defendants Thomas and Wood, however, did not deviate from following Mr. Washington's vehicle.

42.    After following Mr. Washington for about a mile, Defendants Thomas and Wood then sped up behind Mr. Washington's vehicle and initiated their police lights.

43.    Responding to Defendants' orders to pull over, Mr. Washington drove into and stopped in the brightly lit and empty parking lot of the Smoothie King located at 1412 N Hwy 190, Covington, Louisiana, 70433.

44.    At approximately 8:01 PM, Defendant Thomas approached Mr. Washington's vehicle on the driver side and Defendant Wood approached Mr. Washington's vehicle on the passenger side.

45.     Defendant Bridel pulled up to the traffic stop in a separate police car at approximately 8:02 PM, a minute after Defendants Thomas and Wood had already approached Mr. Washington's vehicle.  Defendant Bridel exited his vehicle and stood approximately 10 feet away from the other parties.

46.     After Mr. Washington lowered his window, Defendant Thomas ordered Mr. Washington to instruct Mr. Lane to open the passenger-side door slightly because the passenger-side window would not open.  Mr. Washington and Mr. Lane complied.

47.     Mr. Lane opened the passenger-side door to ensure he was fully visible to Defendant Wood.  Defendant Wood took ahold of the doorframe and swung it open further, maintaining his grip on the door for over a minute.

48.     On the other side of the vehicle, Defendant Thomas requested the license, registration, and car insurance of Mr. Washington.  Mr. Washington asked Defendant Thomas why he was being stopped.

49.     Defendant Thomas refused to inform Mr. Washington why he stopped him until he received Mr. Washington's license, registration, and insurance.

50.     Once Mr. Washington handed Defendant Thomas his license, registration, and insurance, Defendant Thomas informed Mr. Washington that he was stopped for an improper turn and failure to use a turn signal.

51.     Mr. Washington informed Defendant Thomas that he did indeed use his turn signal.[4] Defendant Thomas insisted that he did not and stated to Mr. Washington: "The whole time I was watching you."

---

[4]      Mr. Washington's traffic citation No. 10 007703 was subsequently abandoned, *nolle prosequi*.

52.   On the passenger side of the car, Defendant Wood asked Mr. Lane about his intended destination and where he was coming from.

53.   Mr. Lane informed Defendant Wood that he was coming from Mandeville and was going to get a haircut, lifting his hat.

54.   Mr. Lane, keeping his hands visible and immobile, asked Defendant Wood if he could reach for his phone and call his wife who would then call their lawyer, as he was advised by his legal services provider to do in the event Mr. Lane is pulled over or stopped by police, which he experiences approximately twice a year.

55.   Defendant Wood asked Mr. Lane if he thought he was in trouble or going to jail.

56.   Mr. Lane informed Defendant Wood that he did not think he was in trouble and that he had a clean criminal record, but always liked to call his wife whenever stopped by police out of an abundance of caution.

57.   After questioning and challenging Mr. Lane on his wish to call his wife, Defendant Wood told Mr. Lane to get out of the car, requested his identification, and directed him to stand near Defendant Wood and Thomas' police car.

58.   Mr. Lane complied with all requests.  Mr. Lane walked over to Defendant Thomas and Wood's police car.

59.   Mr. Lane then asked Defendant Wood why Mr. Lane had to get out of the car if he was not the one driving.  Defendant Wood responded by laughing and stating that Mr. Lane was "acting a little weird" by asking to call his lawyer.

60.   On the driver side of Mr. Washington's car, Defendant Thomas continued to question Mr. Washington.

61.   Defendant Thomas asked Mr. Washington where they were driving, and Mr. Washington responded by asking what that had to do with the traffic stop.  Mr. Washington informed Defendant Thomas that he knew his rights under the law.

62.   In response, Defendant Thomas threatened Mr. Washington, telling him he was going to make the traffic stop "go a different way than it has to be."

63.   Defendant Thomas then ordered Mr. Washington to exit his vehicle.

64.   As Mr. Washington exited his vehicle, Defendant Bridel approached Mr. Washington's car and stood directly behind Defendant Thomas.

65.   Defendant Thomas then asked Mr. Washington if he had any weapons and Mr. Washington assured Defendant Thomas that he never carried weapons.

66.   Despite Mr. Washington's statement and the absence of any articulable concern for deputy safety or belief that Mr. Washington was armed and dangerous, Defendant Thomas asked Mr. Washington if he would mind if he patted him down "for officer safety."  Defendant Thomas' actions constituted "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment."  *Terry*, 392 U.S. at 17.

67.   Mr. Washington said nothing and, believing he was not free to decline the deputy's request, submitted to Defendant Thomas' show of authority under coercion.  This belief in part arose from Defendant Wood's previous threat that the traffic stop could "go a different way than it has to be."

68.   Mr. Washington did not give Defendant Thomas verbal or implied consent to search his person.

69.   Defendant Thomas had no reason to believe Mr. Washington was armed and dangerous, as Mr. Washington was compliant and just informed Defendant Thomas that he did not carry weapons.

70.   After confirming through a frisk that Mr. Washington had truthfully informed him that he did not carry weapons, Defendant Thomas ordered Mr. Washington to join Mr. Lane by the police car.

71.   At this point, Defendant Bridel positioned himself at arm's length away from Mr. Washington, where he maintained an unobstructed view of both Mr. Washington and Mr. Lane.

72.   Mr. Lane asked the deputies why they declined to stop the speeding white van that did not have any taillights, to which Defendant Wood responded that they "can't catch everybody." Mr. Lane continued to ask if he could take his phone out and call his wife.  Defendant Thomas yelled at Mr. Lane, shouting that he was not permitted to call his wife and to stop talking. Defendant Thomas asked Defendant Wood if he had retrieved Mr. Lane's identification.

73.   Immediately after Defendant Thomas yelled at Mr. Lane that he could not use his cellphone, Defendant Wood grabbed Mr. Lane's elbow and asked if he could pat him down. Shaken and fearful for his safety should he decline, Mr. Lane acquiesced to the frisk.  Mr. Lane informed Defendant Wood that he had a pocketknife, which Defendant Wood then removed from Mr. Lane's clothing, placing it in the front passenger seat of the police car.

74.   At 8:04 PM, Defendant Thomas walked over to Defendant Wood and asked him for Mr. Lane's identification.  Defendant Wood reached into his breast pocket and handed it over to Defendant Thomas.

75.   Defendant Thomas then headed back to the police vehicle with both IDs and told Defendant Wood to grab the ticket book from the trunk of the police car.  Defendant Thomas began entering Mr. Washington and Mr. Lane's information into his police laptop.

76.   After looking for and retrieving the ticket book from the trunk, Defendant Wood got into the police car with Defendant Thomas.

77.   While Defendants Thomas and Wood sat in the police car, Defendant Bridel remained an arm's length away from Mr. Washington with a clear view of Mr. Lane.

78.   In the police car, Defendant Wood opened the ticket book and asked Defendant Thomas what traffic violations should be written on the ticket.

79.   Defendant Thomas responded that Mr. Washington would "at least get a ticket for improper turning and failure to use a turn signal."  At this moment, Defendant Thomas delayed the drafting of the traffic ticket for the first time by instructing Defendant Wood to "standby" rather than wrap up the stop and write the ticket.

80.   At 8:06 PM, in an apparent attempt to justify the continued extension of the traffic stop, Defendant Thomas radioed the dispatcher to run Mr. Washington and Mr. Lane's names through the police database for both Bogalusa and Washington Parish.

81.   At 8:07 PM, Defendant Wood told Defendant Thomas that he was going to step out of the police car.  In response, Defendant Thomas, continued to delay the writing of the traffic citation by telling Defendant Wood that he would "let [him] know when we are ready for that."

82.   Defendant Wood exited the police car and rejoined Defendant Bridel, Mr. Washington, and Mr. Lane at the front of the police car.

83.   At 8:10 PM, the radio dispatcher informed Defendant Thomas that Mr. Lane's record was clear, and that Mr. Washington had a traffic-related offense allegedly still open in Bogalusa, Louisiana.

84.   At 8:11 PM, Defendant Thomas confirmed that Mr. Washington's Class E driver's license was valid.  While seated in the police car, Defendant Thomas poked his head out the window and informed Mr. Washington that he had a traffic-related warrant still open in Bogalusa.

85.   Mr. Washington was in disbelief about the alleged open warrant in Bogalusa because he had just recently been to court to address it.

86.   At 8:12 PM, Defendant Thomas began yelling at Mr. Washington about the alleged open warrant and accused Mr. Washington of not listening to him.  At this time, Defendant Thomas finally summoned Defendant Wood back to the police car and instructed him to begin writing the traffic citation.

87.   Defendant Wood rejoined Defendant Thomas in the police car as Defendant Bridel continued to keep watch over Mr. Washington and Mr. Lane outside.

88.   Mr. Washington asked if he could return to the car to retrieve the paperwork from Washington Parish confirming that the warrant Defendant Thomas was referring to was closed.  Mr. Washington took a step in the direction of his vehicle.

89.   Defendant Thomas shouted at Mr. Washington that he was not allowed to return to his vehicle to retrieve the document.

90.   Defendant Thomas had no reasonable suspicion that Mr. Washington would flee if he entered the vehicle or that his returning to his vehicle posed a threat to deputy safety.

91.   At 8:13 PM, Defendant Thomas affirmed that Mr. Washington's license plate was valid and proceeded to walk around the vehicle.  Defendant Wood finally began to write the traffic

citation at 8:13 PM, almost eight minutes after Defendant Thomas had determined that it would be issued.

92.   Defendants Thomas and Wood held off on issuing the traffic citation for almost eight minutes despite already having decided which traffic infractions would be included in the ticket and despite already being in possession of the necessary information for the issuance of the ticket, such as Mr. Washington's driver's license, insurance, and registration.

93.   While Defendant Wood wrote the traffic citation as instructed by Defendant Thomas, the latter exited the police car and conducted a walk around Mr. Washington's car, peering inside the car with his flashlight.

94.   When Defendant Thomas finally returned from his unnecessary walkaround, Defendant Wood sought to confirm that Defendant Thomas would write Defendant Thomas' name on the ticket.  Defendant Thomas responded "No, why?"  Defendant Wood laughed and said, "it's your beat, man."  Defendant Thomas dug his heels in and said "no, that's you," and told Defendant Wood that it should be Defendant Wood's name on the ticket.

95.   Defendant Wood shook his head and uttered "That's f—ked," indicating his displeasure that his name would be associated on record with the Incident.

96.   Despite initiating the traffic stop by approaching Mr. Washington's vehicle on the driver side, Defendant Thomas refused to put his name on the traffic citation.  The only deputy's name appearing on the traffic citation is that of Defendant Wood.

97.   Defendant Wood finished writing the traffic citation at 8:18 PM, having required significant assistance from Defendant Thomas—the primary observer and instigator of the stop.

98.   Defendant Thomas returned Mr. Lane's identification to him at 8:19 PM, saying to Mr. Lane that as he was the passenger and not the driver, it isn't "illegal [for a passenger] to have an

expired [driver's license] or ID," thereby confirming that Individual Defendants had no suspicion of criminal activity justifying their investigatory stop of Mr. Lane, confiscation of his ID, and restriction of his physical movement and use of his cell phone.

99.   At this time, Defendant Bridel returned to his police car.

100.   Defendant Wood provided Mr. Washington with the traffic citation at 8:19 PM, which Mr. Washington then signed.   Defendant Thomas thereafter returned Mr. Washington's license, insurance, and registration.   The traffic stop concluded at 8:21 PM—a full twenty minutes after Mr. Washington was pulled over.

**B.     STPSO's Policy and Practice of Preventing Citizens from Filing Misconduct Complaints and Refusing to Enforce Its Citizen Complaint Policy**

101.   On or around March 15, 2021, Mr. Washington and Mr. Lane went to the STPSO office in Covington to file a misconduct complaint against the Individual Defendants.

102.   Doe Defendants, employed and present at three STPSO office locations on March 15, 2021, refused to follow at least three STPSO official written policies regarding citizen complaints in effect at the time.

103.     It is STPSO's official policy that, upon receiving a citizen complaint, the Internal Affairs Division shall conduct "an initial meeting with the complainant and witnesses …validat[e] that complaints against an employee are supported by sufficient facts and meritorious [and] determin[e] whether the facts and allegations of the alleged misconduct constitute criminal behavior." *St. Tammany Parish Sheriff's Office Policy*, Ch. 08, § 0025, Internal Affairs Function B.1, B.3, B.5.

104.     It is STPSO's official policy that "the Internal Affairs Division shall maintain a record of complaints against the STPSO or its employees in an Internal Affairs Control Log." *Id.* at Ch. 08, § 0025, Records, A.

105.   Several employees at the STPSO refused to help Mr. Washington and Mr. Lane with their complaint.   Mr. Washington and Mr. Lane showed the traffic citation to the two employees at the reception desk.   Upon seeing the name of the issuing deputy, one of the employees rolled his eyes and shook his head.

106.   The STPSO employees told Mr. Washington and Mr. Lane that "we don't do that here" when Mr. Washington asked to file a complaint.   The STPSO employees instructed Mr. Washington and Mr. Lane to go to a specific address in Mandeville.

107.   The location at the address provided by the Covington STPSO was the *former* Mandeville STPSO.   It had been shuttered and no one was there to let Mr. Washington and Mr. Lane in, let alone process a complaint.

108.   Fortunately, and with no assistance from STPSO, Mr. Lane recalled seeing what looked to be an SPTSO office in Mandeville when he had last been in town.   Mr. Washington and Mr. Lane proceeded to that location, but were turned away by its staff and again denied the opportunity to notify the Sheriff's Office of its deputies' unconstitutional misconduct.

109.   At every turn, Mr. Washington and Mr. Lane were met with hostility and obstruction rather than a willingness to investigate a citizen complaint.   One Doe Defendant even told Mr. Washington to "get out of [his] office," and informed Mr. Washington that he would "never" write up one of his deputies.

110.   Instead of making the complaint process accessible and transparent to Mr. Washington and Mr. Lane, all STPSO employees Mr. Washington and Mr. Lane encountered met them with contempt and derision, some accusing them of simply being upset about the traffic citation.

111.     On March 15, 2021 at 4:37 PM, Crystal K. Dill from the STPSO emailed Emile J. Lubrano of the STPSO with the subject line "Supervisor Complaint."  In the email, Dill informed Lubrano that Mr. Washington was upset that he was being denied a complaint form by the STPSO so that he could properly file a complaint against the Individual Defendants.  Dill advised Mr. Washington that Lubrano would call Mr. Washington on Tuesday, March 16, 2021 at 8:00 AM and Dill instructed Lubrano to make the call at that time.

112.     On March 15, 2021 at 5:02 PM, Emile J. Lubrano of the STPSO forwarded Dill's email to Christopher Graham and David Maki of the STPSO.  Lubrano directed Christopher Graham to call Mr. Washington on the evening of March 17, 2021, contradicting the information given to Mr. Washington and the instructions given to Lubrano by Dill.

113.     Upon information and belief, neither Emile J. Lubrano nor Christopher Graham nor any other STPSO employee ever contacted Mr. Washington to address his complaint filing concerns.  This is in violation of STPSO's official written policy, effective since January 21, 2015.[5]

114.     Upon information and belief, neither Emile J. Lubrano nor Christopher Graham nor any other employee assessed via investigation whether Mr. Washington's claims were "supported by sufficient facts."  This is in violation of STPSO's official written policy, effective since January 21, 2015.[6]

---

[5]      "Activities of the Internal Affairs Division will include, but are not limited to conducting an initial meeting with the complainant and witnesses."  *Id.* at Ch. 08, § 0025, Internal Affairs Function B.1.

[6]      "Activities of the Internal Affairs Division will include, but are not limited to…validating that complaints against an employee are supported by sufficient facts and are meritorious."  *Sheriff's Office Policy*, Ch. 08, § 0025, Internal Affairs Function B.3.

115.    The 2021 Internal Affairs Log contains no record of Mr. Washington's attempt to report Defendants' misconduct nor is there any record of Mr. Lane's attempts.  This is in violation of STPSO's official written policy, effective since January 21, 2015.[7]

### C.    Racial Profiling in Louisiana and Its Impact on Mr. Washington and Mr. Lane

116.    Upon information and belief, the Individual Defendants repeatedly violated Mr. Washington and Mr. Lane's Fourth Amendment rights due to Mr. Washington and Mr. Lane being Black Americans.  There is no evidence suggesting that the deputies feared for their or the public's safety or suspected either men of criminal activity.  This is evidenced by, among other things, the Individual Defendants:

    a)    explicitly stating, as evidenced by body camera recordings, that they were monitoring Mr. Washington and Mr. Lane after noticing them pumping gas at the gas station (before any alleged traffic violation occurred);

    b)    tailing Mr. Washington and Mr. Lane from a distance for approximately a mile after the alleged traffic violation occurred during which a van without taillights dangerously sped by the deputies, the observation of which was audibly and explicitly acknowledged by Individual Defendants on their body camera recordings;

    c)    speeding up to pull Mr. Washington over instead of the erratic driver of the aforementioned van;

    d)    immediately questioning Mr. Washington and Mr. Lane about contraband and weapons during an allegedly routine traffic stop;

    e)    ordering Mr. Lane out of the car and frisking him for the inchoate reason that he was "acting a little weird";

    f)    frisking Mr. Washington after he confirmed that he was not armed;

    g)    continuously denying Mr. Lane's multiple requests to call his wife out of an abundance of caution and fear for his life, culminating in Defendant Thomas yelling at Mr. Lane to "stop talking";

---

[7]    "The Internal Affairs Division shall maintain a record of complaints against the STPSO or its employees in an Internal Affairs Control Log." *Id*. at Ch. 08, § 0025, Records, A.

h)  punishing Mr. Lane for his speech and requests by unjustifiably confiscating his ID and further extending the stop to conduct a criminal record check on Mr. Lane; and

i)  deliberately prolonging the stop to search for reasons to further detain Mr. Washington and Mr. Lane.

117.  Upon information and belief, due to the unequivocal absence of suspicion or threat to the deputies and general public safety, the initial surveillance, questions, weapons frisks, disrespect, and detention were racially motivated and reflect the Individual Defendants' internalized racial stereotyping of delinquency and dangerousness rooted in the history of criminalization of Black people in Louisiana.[8]

118.  In Louisiana, Black individuals are 3.2 times more likely to be arrested for marijuana possession than white individuals, despite evidence that black people and white people use marijuana at similar rates.[9]

119.  In Louisiana, Black people constitute 33% of state residents, but 67% of people in prison and 52% of people in jail.[10]

120.  The disparate treatment Black individuals face in St. Tammany Parish is evidenced by the pervasive racist culture the STPSO maintains, including through the aforementioned words of its former Sheriff, Rodney "Jack" Strain.[11]

---

[8]  *See, e.g.*, J. Michael Kennedy, *Sheriff Rescinds Order to Stop Blacks in White Areas*, L.A. Times, Dec. 4, 1986, https://www.latimes.com/archives/la-xpm-1986-12-04-mn-1380-story.html (explaining that the then-sheriff of Jefferson Parish Sheriff's Office reportedly said, "If there are some young blacks driving a car late at night in a predominantly white area, they will be stopped…. If you live in a predominantly white area and two blacks are in a car behind you, there's a pretty good chance they're up to no good.") (last visited March 9, 2022).

[9]  Southern Poverty Law Center, *Racial Profiling in Louisiana—Unconstitutional and Counterproductive* (Sept. 18, 2018), https://www.splcenter.org/sites/default/files/leg_special_report_racial_final.pdf (last visited March 9, 2022).

[10]  *See* Vera Institute of Justice, *Incarceration Trends in Louisiana*, https://www.vera.org/downloads/pdfdownloads/state-incarceration-trends-louisiana.pdf (last visited March 9, 2022).

[11]  *See* Alan Bean, *Tragedy in St. Tammany*, SocialistWorker.org (Feb. 10, 2010), at https://socialistworker.org/2010/02/10/tragedy-in-st-tammany (last visited Mar. 9, 2022).

23

121.    The investigatory stop of Mr. Washington and Mr. Lane was conducted by three armed deputies in a brightly lit, public parking lot, and yet, Mr. Washington and Mr. Lane were treated with an unwarranted level of suspicion.  Among other things, Mr. Washington was frisked despite there being no articulable threat to deputy safety, and yelled at when he asked to retrieve proof that his open warrant was actually closed.  Meanwhile, Mr. Lane's request to call his wife out of an abundance of caution was both denied and seen as "weird."  Upon information and belief, the surveillance, questions, and weapons frisks were racially motivated and reflect the Individual Defendants' internalized racial stereotyping of delinquency and dangerousness rooted in the history of criminalization of Black people in Louisiana.[12]

122.    St. Tammany Parish, Louisiana, is predominantly white.  According to the 2021 U.S. Census, the St. Tammany population is approximately 83.2% white.  Only around 12.7% of the population in St. Tammany was Black or African American in 2021.

123.    Mr. Lane had personal experience of being frequently stopped when he lived in Covington, Louisiana, which is a primary reason why he moved to Mandeville several years ago and subsequently avoided Covington.

124.    The practice of racial profiling, which is based only on a person's skin color and not on reasonable suspicion, plagues the United States. In this country, Black adults are about five times more likely than White adults to report being unfairly stopped by police because of their race or ethnicity.[13]

---

[12]    *Supra* at n.10.

[13]    Drew DeSilver, Michael Lipka & Dalia Fahmy, *10 things we know about race and policing in the U.S.*, Pew Rsch. Ctr. (June 3, 2020), https://www.pewresearch.org/fact-tank/2020/06/03/10-things-we-know-about-race-and-policing-in-the-u-s/ ("Majorities of both black and white Americans say black people are treated less fairly than whites in dealing with the police and by the criminal justice system as a whole.") (last visited March 9, 2022).

125.     Because racial policing is so prevalent in Louisiana, the Louisiana Legislature requires law enforcement agencies to either adopt a written policy against racial profiling or to submit data about traffic citations to the Louisiana Department of Public Safety and Corrections. Rather than provide a written policy and education to its employees, STPSO reports its data to the Louisiana Incident-Based Reporting System ("LIBRS").

126.     As a result of the Incident, Mr. Lane suffers from ever-present anxiety.  In the days following the Incident, Mr. Lane was crying and shaking uncontrollably.  In the end, he was unable to muster the emotional and physical energy to attend the birthday gathering to honor his late father.

127.     Mr. Lane continues to suffer ongoing emotional distress, including a constant fear of being detained and harassed by police as a passenger in the car of another Black man, anxiety, stress, hypervigilance, and fear of leaving his home.  These debilitating effects extend to his workplace, a yacht club in Mandeville where Mr. Lane frequently comes into contact with uniformed STPSO employees and law enforcement.  After the March 13, 2021 Incident, Mr. Lane often leaves his workplace before the end of his shift if he encounters a uniformed deputy for fear of being targeted and mistreated as a Black man in an affluent area populated largely by White adults. His anxiety, directly stemming from the Incident, resulted in a reduction of Mr. Lane's work hours, and thus his income, by 40%.

128.     Mr. Lane's anxiety and fear hinders his ability to spend time with his grandchildren who live outside of the Mandeville area and curtails his freedom to travel, socialize and work.

129.     Since this incident, Mr. Washington suffers from fear of being surveilled by STPSO deputies while doing mundane activities such as pumping gas or driving.  He also fears being stopped and harassed by STPSO deputies.  He fears that, in the event he suffers a future incident

similar to the March 13, 2021 Incident, his complaints to authorities will again not be acknowledged or taken seriously.

130.    In order to prevent a reoccurrence of the March 13, 2021 Incident, Mr. Washington and Mr. Lane expended much time and energy attempting to file a complaint against Individual Defendants, including traveling to multiple STPSO offices, suffering through every STPSO employee they came into contact with being dismissive of their complaints, and pursuing multiple channels of communication with the STPSO, including a phone call—all to no avail.

131.    Mr. Washington's fear hinders his ability to move about freely and travel to see his family, including Mr. Lane.

### FIRST CAUSE OF ACTION

**Violation Under 42 U.S.C. §1983—Unlawful Extension of Detention in Violation of the Fourth Amendment**

(Washington and Lane against Defendants Thomas and Wood)

132.    Mr. Washington and Mr. Lane hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

133.    It was clearly established as of March 13, 2021 that a traffic stop may last no longer than is necessary to effectuate its purpose.

134.    To further detain suspects during a traffic stop under the Fourth Amendment, an officer must have reasonable suspicion based on specific and articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the persons detained are engaged in criminal activity.  Police officers may not detain people, or engage in searches and seizures, if they do not have reason to believe the extended detention would lead to evidence relating to the reason for the stop.  *Rodriguez*, 575 U.S. at 348.

135.     Nothing arose during the Defendants' detention of Mr. Washington and Mr. Lane that justified postponing the writing of the traffic citation and extending the detention of Mr. Washington and Mr. Lane by approximately eight minutes.

136.     There was no lawful justification for extending the stop beyond an initial request for Mr. Lane and Mr. Washington's identification and Mr. Washington's paperwork.

137.     Mr. Washington's traffic stop was impermissibly extended without reasonable suspicion or probable cause and was therefore unlawful and violative of Mr. Washington and Mr. Lane's rights under the Fourth Amendment.

138.     The Defendants' conduct was motivated by an evil motive or intent and/or involved reckless or callous indifference to Mr. Washington and Mr. Lane's federally protected rights.

139.     At the time that the Defendants impermissibly extended the detention of Mr. Washington and Mr. Lane, they were operating under the color of law.  They were wearing STPSO uniforms and held themselves out as deputies.

140.     No reasonable deputy in the Defendants' position would have reasonably believed that lawful justification existed to prolong addressing the purpose of the traffic stop by delaying the writing of the traffic citation.

141.     The Defendants' conduct thus violated Mr. Washington and Mr. Lane's clearly established rights, of which reasonable deputies would know or should know.

142.     As a direct and proximate result of the Defendants' conduct as set forth above, Mr. Washington and Mr. Lane suffered and continue to suffer fear, embarrassment, humiliation, and pain, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

**Violation under 42 U.S.C. §1983—Unlawful Seizure and/or False Arrest in Violation of the Fourth Amendment of the U.S. Constitution**

(Gregory Lane against Individual Defendants Bridel, Thomas, and Wood)

143. Mr. Lane repeats and realleges each and every allegation contained in the previous paragraphs of this Complaint as if fully alleged herein.

144. At the time of the Incident, Mr. Lane had clearly established rights under the Fourth Amendment of the U.S. Constitution guaranteeing citizens the right to be secure in their persons and protecting them from unreasonable search and seizure by law enforcement officers.

145. The threatening presence of several deputies, physical touching of the citizen's person, and the language or tone of voice indicating that compliance with a law enforcement officer's request might be compelled, indicate a seizure. *United States v. Mendenhall*, 446 U.S. 544 (1980).

146. When a reasonable person would not believe they were free to leave an encounter with law enforcement, it is a seizure.

147. Individual Defendants' verbal commands, searching of Mr. Lane's person, denial of the use of his cellphone and confiscation of his ID made it clear to any reasonable person that Mr. Lane was not free to leave.

148. It was clearly established at the time of Mr. Lane's unlawful detention that even a "brief detention" without an exception to the warrant requirement is prohibited by the Fourth Amendment. *Brignoni–Ponce*, 422 U.S. at 878.

149. It was clearly established at the time of Mr. Lane's unlawful detention that a passenger may be ordered to exit a vehicle out of concern for deputy safety, but subsequent seizures must be individually justified by an articulable reasonable suspicion of criminal activity or that the detained individual is armed and dangerous.

150. It was clearly established at the time of Mr. Lane's unlawful detention that a seizure must be justified at its inception. *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020).

151.   It was clearly established that Fourth Amendment seizures are subject to a balancing test, weighing individual intrusion against legitimate government interests.  *Keller v. Fleming*, 952 F.3d 216, 225 (5th Cir. 2020).

152.   It was clearly established under Louisiana law at the time of Mr. Lane's unlawful detention that an inchoate, unparticularized hunch is insufficient grounds for detention.  La. C. Crim. Pro. art. 215.1(A).

153.   By virtue of being a passenger in a lawfully stopped vehicle, Mr. Lane was undeniably seized under the Fourth Amendment under the "*de minimis* intrusion" exception to the warrant requirement.  However, Individual Defendants' subsequent actions limiting Mr. Lane's liberty of movement and right to be free from intrusion onto his person far exceeded the scope of what is permissible, under *Maryland v. Wilson* and *Terry v. Ohio*, which allow for further investigation based solely on "reasonable suspicion."

154.   The lack of reasonable suspicion to conduct an investigatory stop of Mr. Lane would have been evident to any reasonable person based on the facts and circumstances within Individual Defendants' knowledge at the time.

155.   Individual Defendants did not witness Mr. Lane break any law, nor did they have any reason to believe that he had or would break any law.  At the end of the encounter, Defendant Thomas stated directly to Mr. Lane that he hadn't been the one driving and that having an expired ID is not illegal, communicating explicitly that there was never any concern regarding illegal activity on Mr. Lane's part.

156.   Because Individual Defendants detained Mr. Lane in a brightly lit parking lot with no vehicles except for the two police cruisers and Mr. Washington's automobile, there was no danger to themselves or the community because of traffic.

157.   Because the ratio of individuals present were three deputies to two citizens, absent evidence of danger, there was no risk to the Individual Defendants' safety.

158.   Individual Defendants had no reason to believe that Mr. Lane using his cellphone would threaten deputy safety or the successful resolution of the traffic stop because he had already informed Individual Defendants about, and allowed them to retrieve, his pocketknife.  Mr. Lane, fearing that the deputies were worried that he was armed, continuously held his hands out and explained any movement he sought to make.  Defendant Wood clearly did not consider Mr. Lane a threat because he eventually told Mr. Lane that they were "cool" because he had frisked him, but Defendant Thomas still restricted Mr. Lane's freedoms by arbitrarily deciding he could not use his phone.

159.   Defendant Bridel watched as Mr. Lane's freedoms were restricted each time and neither interjected nor attempted to influence Defendants Thomas and Wood to stop their unreasonable conduct of extended detention and seizure of Mr. Lane.

160.   Any reasonable law enforcement deputy would have known that searching Mr. Lane, confiscating his identification, yelling at him, grabbing his elbow without consent, ordering him to stand in and place his hands in specific locations, continuously denying him the use of his cellphone and detaining him to run computer and dispatch checks on his record, would amount to a seizure separate from the lawful stop of Mr. Washington, requiring a separate reasonable suspicion of criminal activity or threat to deputy or public safety.

161.   Any reasonable law enforcement deputy would know that an investigatory stop without reasonable suspicion would violate clearly established Fourth Amendment rights.

162.   As a direct and proximate result of this unlawful seizure, Mr. Lane has suffered emotional, economic, and dignitary harm.

## THIRD CAUSE OF ACTION

**Violation of Article I Section 5 of Louisiana Constitution—Unlawful Seizure and/or False Arrest**

(Lane against Defendants Bridel, Wood and Thomas)

163.    Mr. Lane repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

164.    Article I, Section 5 of the Louisiana Constitution provides that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy."

165.    It is well-established that Article 1, Section 5 of the Louisiana Constitution does not merely duplicate the Fourth Amendment.  Rather, it represents a conscious choice by the citizens of Louisiana to give "a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution." *State v. Hernandez*, 410 So. 2d 1381, 1385 (La. 1982).  The Louisiana Supreme Court has consistently interpreted "the right of privacy to afford even more stringent protection of individual liberty than the Fourth Amendment." *State v. Perry*, 610 So. 2d 746, 756 (La. 1992).  As demonstrated by the facts and circumstances complained of herein, Individual Defendants seized Mr. Lane, using force and words a reasonable person would be afraid to ignore, including by grabbing his elbow, repeatedly yelling at him, instructing him to stand in specific locations and depriving him of the use of his phone to call his wife and attorney.

166.    At the time Individual Defendants seized Mr. Lane, he had clearly established rights under Article I, Section 5 of the Louisiana Constitution to be free from unreasonable seizure and the invasion of his privacy.

167.     Individual Defendants' unlawful seizure was objectively unreasonable because of the facts and circumstances complained of herein, including because, despite acting under color of law, Individual Defendants had no suspicion that Mr. Lane was engaged in any illegal activity.

168.     As demonstrated by the facts and circumstances complained of herein, Individual Defendants were, at all relevant times, acting under the color of law in their capacity as STPSO deputies.

169.     As a direct and proximate consequence of Individual Defendants' acts and omissions, Mr. Lane has suffered and continues to suffer injury, including emotional distress and loss of income.  Therefore, Mr. Lane is entitled to compensatory damages, costs, and attorney's fees for violation of his clearly established right to be free from unreasonable seizure.

170.     Moreover, the facts and circumstances complained of herein demonstrate that Individual Defendants engaged in this conduct willfully, intentionally, and with reckless disregard for Mr. Lane' constitutionally protected rights.  Accordingly, Individual Defendants are liable for punitive damages for the unlawful seizure of Mr. Lane, in an amount to be proven at trial.

## **FOURTH CAUSE OF ACTION**

**Violation Under 42 U.S.C. §1983—Monell Liability for Failure to Investigate and Supervise**

(Washington and Lane against Defendant Smith)

171.     Mr. Washington and Mr. Lane hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

172.     At all times relevant to this action, Defendant Smith had policymaking authority and otherwise controlled the supervisory practices of STPSO.

173.     STPSO (through Defendant Smith) has developed and maintained formal or informal policies, practices, and customs exhibiting deliberate indifference to the constitutional

rights of individuals in St. Tammany Parish, which caused the violation of Mr. Washington and Mr. Lane's rights, as described herein, and the resultant damages suffered.

174. Defendant Smith, as the employer of Individual Defendants Thomas, Wood, and Bridel should have provided adequate oversight over STPSO deputies' conduct with respect to a procedure as routine and frequent as a traffic stop.

175. Defendant Smith should have known that STPSO deputies are highly likely to be placed in the recurrent situation of stopping, detaining, and questioning suspects, and correspondingly have a clear constitutional duty to refrain from initiating unlawful seizures and detentions.

176. Nevertheless, Defendant Smith took no action to ensure that deputies follow their constitutional duty. With blatant disregard of the highly predictable occurrences referenced above, Defendant Smith failed to supervise Individual Defendants Thomas, Wood, and Bridel.

177. As a direct result of Defendant Smith's failure, Mr. Washington and Mr. Lane suffered an unnecessarily prolonged detention of a stop and subsequent emotional distress and an infringement of their clearly established rights under the U.S. Constitution, in particular their Fourth Amendment right to be free from unreasonable seizure.

178. Mr. Washington and Mr. Lane traveled to multiple STPSO offices to complain about the Individual Defendants' conduct and were met with hostility and obstruction at every turn. Aside from being denied an accessible complaints process, Mr. Washington and Mr. Lane suffered the indignity of being continuously met with contempt and derision by all STPSO employees and being accused of simply being upset about the traffic citation.

179. Upon information and belief, a Doe Defendant threw Mr. Washington out of his office, stating that he would "never" write up one of his deputies.

180.    Upon information and belief, despite Mr. Washington and Mr. Lane's repeated efforts and compliance with instructions from STPSO employees themselves, no STPSO employee followed up with their complaint attempts.

181.    Further, STPSO's claim that it has no record of any complaints made by the Plaintiffs despite Mr. Washington and Mr. Lane's repeated and fruitless attempts of filing a complaint demonstrates, at best, the absolute lack of transparency of its practices and policies and, at worst, intent to cover up citizen complaints of deputy misconduct.

182.    Defendant Smith's failure to supervise bad actors, along with Defendant Smith's tacit approval of STPSO employees' conduct, has enabled an extraordinarily difficult (if not, nonexistent) complaint-filing process.  As a result, not only were Mr. Washington and Mr. Lane denied the basic right to file a complaint, but the process also further compounded the emotional distress from the indignity they suffered during the March 13, 2021 Incident.

183.    Defendant Smith has enabled STPSO's policies, customs, and practices exhibiting deliberate indifference to the rights of people of color.  Such indifference has fostered an environment in which deputies suffer no consequences nor expect to be held accountable for their blatant disrespect of people of color.

184.    The FY2021 STPSO Budget Book states that the Internal Affairs Department investigated 30 external complaints in 2019 and "responded to and investigated complaints" in 2020.  The Budget Book projected that the Internal Affairs Department would investigate 35 external complaints in 2021.

185.    Given the numerous external complaints investigated by the Internal Affairs Department, Defendant Smith and STPSO were on notice that several of their deputies have been engaging in misconduct.  Still, Defendant Smith and STPSO did not take any assertive action to

34

discipline any of their deputies, continuing a longstanding pattern or policy of failing to hold accountable deputies who evade constitutional requirements.[14]

186.    Defendant Smith's policies, practices, and customs of failing to supervise STPSO deputies were the moving force and the proximate and producing cause of Mr. Washington and Mr. Lane's damages.

## FIFTH CAUSE OF ACTION

### Violation Under 42 U.S.C. §2000(d)—Title VI of the Civil Rights Act of 1964

(Washington and Lane against Defendant Smith)

187.    Mr. Washington and Mr. Lane hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

188.    The STPSO is engaging in racial discrimination while receiving federal funds in violation of Title VI of the Civil Rights Act of 1964.

189.    STPSO deputies, under the supervision of Defendant Smith, unlawfully rely on race, color, or national origin in their enforcement of traffic laws.

190.    Black community members are subjected to disparate treatment by law enforcement as compared to similarly situated non-Black community members in Louisiana broadly, and within St. Tammany Parish.

191.    In Louisiana, Black individuals are 3.2 times more likely to be arrested for marijuana possession than white individuals, despite evidence that black people and white people use marijuana at similar rates[15].

---

[14]    STPSO has not decertified a single officer in the last 15 years.  *See* John Kelly and Mark Nichols, *Search the list of more than 30,000 police officers banned by 44 states*, USA Today (April 24, 2019), https://www.usatoday.com/in-depth/news/investigations/2019/04/24/biggest-collection-police-accountability-records-ever-assembled/2299127002/ (last visited March 9, 2022).

[15]    *Supra* at n.9.

192.     In Louisiana, Black people constitute 33% of state residents, but 67% of people in prison and 52% of people in jail.[16]

193.     The disparate treatment Black individuals face in St. Tammany Parish is evidenced by the pervasive racist culture the STPSO maintains.

194.     The STPSO's former sheriff, Sheriff Rodney "Jack" Strain, confirmed the racist practices of the STPSO in 2010 by stating that, "if you're gonna walk the streets of St. Tammany Parish with dreadlocks and chee wee hairstyles, then you can expect to be getting a visit from a sheriff's deputy…you can guarantee that things that you got away with in the city will not be tolerated in this parish."[17]

195.     Given that the vast majority of persons wearing dreadlocks, twists, or braids (so-called "chee wee hairstyles") are Black Americans, Sheriff Strain's comments openly pronounced a policy of targeting Black people on an unconstitutional basis.

196.     In 2014, several high-ranking detectives at the STPSO were exposed for exchanging racist and offensive emails amongst each other. Several of these racist emails included offensive jokes about Black Americans, referring to them as "monkey[s]" and "animals."[18]

197.     Upon information and belief, these high-ranking detectives were not fired.

198.     Upon information and belief, employees of the STPSO have been made aware that STPSO deputies are engaging in racial profiling but have refused to take corrective action.

199.     Mr. Washington and Mr. Lane first sought to file a complaint with the STPSO against Individual Defendants Thomas, Wood, and Bridel on March 15, 2021.  Upon information

---

[16]     *See supra* at n.10.

[17]     *See supra* at n.11.

[18]     David Lohr, *The 13 Racist Police Emails You Didn't Read*, Huffington Post (Apr. 9, 2015), https://www.huffpost.com/entry/st-tammany-parish-sheriffs-office-racist-emails_n_7027274 (last visited March 9, 2022).

and belief, as of the date of this Complaint, STPSO employees have continued to ignore Mr. Washington and Mr. Lane's request for assistance.

200.    As a result, Defendant Smith has failed to develop and implement policies and practices that generally would be expected of law enforcement agencies, and specifically would be expected of law enforcement agencies to protect against and hold deputies accountable for discriminatory policing and constitutional violations.

201.    There is no legitimate law enforcement purpose that explains these failures.  These failures are evidence that STPSO's discrimination against Black members of the St. Tammany Parish community and specifically, Mr. Washington and Mr. Lane, is either, at worst, intentional, or, at best, that the STPSO and Defendant Smith callously disregard the dignity and constitutional rights of Black Americans.

202.    At all relevant times described in this Complaint, the STPSO had been and continues to be a recipient of federal financial assistance, either directly or through another recipient of federal financial assistance.

203.    In the STPSO Annual Financial Report for fiscal year 2021, the STPSO received $2,724,878 in federal grants.[19]  These grants went towards the STPSO's General Fund which is the primary operating fund for the sheriff to use to support law enforcement services, including policing.

204.    Policing is a service the STPSO provides with the intention to serve and protect the members of the St. Tammy Parish community.

---

[19]    *St. Tammany Parish Sheriff's Office Annual Comprehensive Financial Report* at 34 (June 30, 2021), https://www.STPSO.com/images/uploads/FY2021.pdf.

205.    Consequently, Mr. Washington and Mr. Lane were both intended beneficiaries of the federal financial assistance the STPSO received.

206.    As a condition of receiving federal financial assistance, the STPSO certified that it agreed to comply with all requirements imposed by Title VI of the Civil Rights Act of 1964.

207.    Nevertheless, STPSO has engaged in law enforcement practices with the intent to discriminate against Black drivers on the basis of race, color, or national origin with the help of these federal funds.

208.    The STPSO's discriminatory law enforcement practices and intentional discrimination violate Title VI of the Civil Rights Act of 1964.

209.    As a result, Mr. Washington and Mr. Lane suffered damages in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

**Violation Under Article I, Section 5 of Louisiana Constitution—Unlawful Extension of Detention**

(Washington and Lane against Defendants Thomas and Wood)

210.    Mr. Washington and Mr. Lane hereby incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

211.    It was clearly established as of March 13, 2021 under the Constitution of the State of Louisiana of 1974, Article I, Section 5 that every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy.

212.    It was clearly established as of March 13, 2021 under Louisiana Code of Criminal Procedure Article 215.1(D) that during the detention of an alleged violator of any provision of the motor vehicle laws of Louisiana, a law enforcement officer may not detain a motorist for a period

of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity.

213.    Nothing arose during the Defendants' detention of Mr. Washington and Mr. Lane that justified postponing the writing of the traffic citation and extending the detention of Mr. Washington and Mr. Lane by approximately eight minutes.

214.    There was no lawful justification for extending the stop beyond an initial request of Mr. Lane and Mr. Washington's identification and Mr. Washington's paperwork.

215.    Mr. Washington's traffic stop was impermissibly extended beyond the time reasonably necessary to complete the investigation into the alleged traffic infractions and to issue a citation for the alleged violations because Defendants Thomas and Wood lacked reasonable suspicion of additional criminal activity.

216.    Defendant Thomas and Wood's extension of the traffic stop was therefore unlawful and violative of Mr. Washington and Mr. Lane's rights under the Constitution of the State of Louisiana of 1974, Article I, Section 5 against unreasonable seizures.

217.    At the time the Defendants impermissibly extended the detention of Mr. Washington and Mr. Lane, they were operating under the color of law. They were wearing uniforms of the STPSO and held themselves out as deputies.

218.    No reasonable deputy in the Defendants' positions would have believed that lawful justification existed to prolong addressing the purpose of the traffic stop by delaying the writing of the traffic citation.

219.    The Defendants' conduct thus violated Mr. Washington and Mr. Lane's clearly established rights, of which reasonable deputies would know or should know.

220.     As a direct and proximate result of the Defendants' conduct as set forth above, Mr. Washington and Mr. Lane suffered damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Violation Under Louisiana Statute §14:46 – False Imprisonment

(Washington and Lane against Defendants Thomas and Wood)

221.     Mr. Washington and Mr. Lane incorporate and allege the above allegations in full.

222.     Mr. Washington and Mr. Lane were detained by Defendants Thomas and Wood longer than reasonably necessary to effectuate the purpose of the traffic stop and issue a citation for the alleged traffic infractions.

223.     Defendants Thomas and Wood did not have reasonable suspicion of additional criminal activity to justify prolonging the detention of Mr. Washington and Mr. Lane.

224.     Defendants Thomas and Wood's prolonged detention of Mr. Washington and Mr. Lane was therefore unlawful.

225.     As a direct and proximate result of the unlawful detention, Mr. Washington and Mr. Lane suffered damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Violation Under 42 U.S.C. §1983—Unlawful Search under the Fourth Amendment to the U.S. Constitution and Article 1 Section 5 of the Louisiana Constitution

(Mr. Washington against Defendant Thomas)

226.     Mr. Washington incorporates and alleges the above allegations in full.

227.     It was clearly established at the time of Defendant Thomas' search of Mr. Washington that "where there is coercion, there cannot be consent." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968).

228.    Mr. Washington intentionally did not verbally consent to Defendant Thomas' request to search him.

229.    Because Defendant Thomas had threatened Mr. Washington that failure to consent to his orders could make the traffic stop "go a different way," Mr. Washington's gesture of submission to Defendant Thomas was coerced and did not constitute implied consent.

230.    As a direct and proximate result of this unlawful and humiliating seizure, Mr. Washington has suffered and continues to suffer emotional and dignitary harm.

231.    As a direct and proximate result of the unlawful search, Mr. Washington suffered damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

**Invasion of Privacy in violation of Article 1, Section 5 of the Louisiana Constitution**

(Mr. Washington against Defendant Thomas)

232.    Mr. Washington incorporates and alleges the above allegations in full.

233.    Defendant Thomas intentionally and unreasonably intruded upon Mr. Washington's privacy interest by frisking him despite his clear lack of consent.

234.    There was no legal basis for searching Mr. Washington's person. Upon information and belief, Defendant Thomas searched Mr. Washington in the hope of finding evidence of crime unrelated to the purported basis for the traffic stop. The search of a person without lawful basis is an unconstitutional invasion of privacy.

235.    Mr. Washington's privacy interest in the security of his own person outweighs Defendant Thomas's unlawful interest in searching him for evidence of a crime without a lawful justification for doing so.

236.    As a direct and proximate result of this invasion of privacy, Mr. Washington suffered and continues to suffer embarrassment, humiliation, pain, suffering, and fear of the STPSO.

### TENTH CAUSE OF ACTION

**Conspiracy to Commit §1983 Violation of Fourth Amendment Rights**

(Washington and Lane against Defendants Thomas and Wood)

237.    Mr. Washington and Mr. Lane incorporate and allege the above allegations in full.

238.    Defendants acted under color of state law at all times relevant hereto.

239.    It is clearly established that an agreement to perform an illegal act under color of state law that results in an actual constitutional deprivation is a conspiracy. *Bevill v. Fletcher*, No. 20-40250, 2022 WL 420752, at *3 (5th Cir. Feb. 11, 2022) (citing *Whisenant v. City of Haltom*, 106 F. App'x 915, 917 (5th Cir. 2004)).

240.    The facts set out in this complaint amount to a conspiracy to commit a 1983 violation of Mr. Washington and Mr. Lane's Fourth Amendment rights under 42 U.S.C. §1983 for which both the STPSO, and Defendants Wood and Thomas are jointly and severally liable and for which each Defendant is separately liable.

241.    Under color of state law, Defendants agreed and conspired to unlawfully extend the detention of Mr. Washington and Mr. Lane using a variety of delay tactics.  These delay tactics transformed a lawful traffic stop into an unconstitutional seizure of Mr. Washington and Mr. Lane.

242.    Upon information, belief, and per the Defendants' body camera footage, Defendant Thomas, after confirming that Mr. Washington would be issued a citation for improper turning and failure to use a turn signal, instructed Defendant Wood not to write it.

243.    Defendant Thomas, without any reasonable suspicion, continued to search for further reasons to justify what he knew was an unconstitutional detention, evidenced by his refusal

to put his name on the citation.  Meanwhile, Defendant Wood waited in the passenger seat for the expected fruits of Defendant Thomas' search, which never came.

244.    As a result of Defendants' actions and agreement, Mr. Washington and Mr. Lane were deprived of their constitutional right to be free from unreasonable seizure.

245.    Defendants are thus conspiratorially liable for all claims set forth in this complaint, pursuant to Louisiana Civil Code §2324 and 42 U.S.C. §1983.

246.    Defendants acted with deliberate indifference to Mr. Washington's and Mr. Lane's rights, and they acted maliciously, willfully, wantonly and in reckless disregard of those rights. Defendants acted with the specific intent to deprive Mr. Washington and Mr. Lane of their rights and cause substantial injury, distress, humiliation and embarrassment to Mr. Washington and Mr. Lane, rendering appropriate the award of punitive damages against each individual defendant, separately, in his individual capacity.

## ELEVENTH CAUSE OF ACTION

### Respondeat Superior pursuant to Louisiana Civil Code Article 2320

(Washington and Lane against Defendant Smith and Doe Defendants)

247.    Mr. Washington and Mr. Lane incorporate and allege the above allegations in full.

248.    Mr. Washington and Mr. Lane assert that Defendant Smith and Doe Defendants violated Louisiana law because of their negligence in supervising Individual Defendants.

249.    Defendant Smith and Doe Defendants were, at all relevant times, employed by the STPSO.

250.    Defendant Smith and Doe Defendants were responsible for supervising and investigating STPSO officers, as appropriate, including Individual Defendants.

251. As their superiors, Defendant Smith and Doe Defendants are responsible for Individual Defendants' misconduct in the course of their employment, including their violation of Mr. Washington and Mr. Lane's state constitutional and statutory rights.

252. In addition, Defendant Smith and Doe Defendants failed to investigate Individual Defendants' conduct.

253. At least three times, Mr. Washington and Mr. Lane sought to file a complaint after the incident. At least three times, Doe Defendants explicitly refused to record their complaint or, at minimum, provide Mr. Washington and Mr. Lane with the complaint forms. One Doe Defendant even threw Mr. Washington out of his office, plainly stating that he would "never" write up one of his deputies.

254. STPSO records show that on Monday, March 15, 2021, Mr. Washington again attempted to initiate a misconduct complaint by speaking with emergency dispatcher, Crystal K. Dill. At 4:37 PM, Deputy Dill forwarded the complaint to Defendant Lubrano, informing him that she had told Mr. Washington to expect a follow-up phone call on Tuesday, March 16, 2021 at 8:00 AM. Twenty-five minutes later, at 5:02 PM, Defendant Lubrano ducked his responsibility and forwarded Deputy Dill's email to Defendants Graham and Maki, with instructions to delay their contacting Mr. Washington by a day and a half.

255. Neither Mr. Washington nor Mr. Lane ever received any follow-up or results to their requests, nor were the misconduct allegations ever recorded in the STPSO Internal Affairs Control Log, in violation of official STPSO policy.

256. Upon information and belief, Defendant Smith and Doe Defendants were aware, or should have been aware, due to Mr. Washington and Mr. Lane's attempts to lodge a complaint and the email from Deputy Dill, that Individual Defendants engaged in misconduct by violating Mr.

Lane and Mr. Washington's constitutional and statutory rights.  But Defendant Smith and Doe

Defendants failed to investigate the Individual Defendants for this conduct.  This is because, on

information and belief, STPSO arbitrarily decides whether or not to investigate or even record

citizen complaints in violation of its own policies in effect since 2015.  Indeed, STPSO Internal

Affairs only logged ten complaints for all for 2021, none of which resulted in a finding of

misconduct.[20]   Upon information and belief, SPTSO did not discipline a single deputy for

misconduct in 2021.

257.    As a direct and proximate cause of Defendant Smith and Doe Defendants' failure

to investigate Individual Defendants and promptly discipline them per STPSO policy, Mr.

Washington and Mr. Lane suffered injury and maintain a persistent fear of STPSO, knowing that

its deputies will not be held accountable for misconduct.

258.    Defendant Smith and Doe Defendants' failure to supervise and investigate deputies

amount to deliberate indifference, because they were or reasonably should have been aware that

this failure would result in a constitutional violation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Mr. Washington

and Mr. Lane's favor and against each of the Defendants, and award the following relief:

A.    Declaration that Defendants' conduct violated the Fourth Amendment of the United
     States Constitution and Louisiana Law; including Defendant Smith and Doe
     Defendants' ongoing policies and/or customs of failing to properly investigate
     complaints of misconduct and supervise and discipline officers/deputies who violate
     policies and constitutional rights;

---

[20]    STPSO Internal Affairs Control Log (2021).

B.   Compensatory damages, including damages for emotional distress on all claims allowed by law in an amount to be determined at trial;

C.   Punitive damages;

D.   Reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

E.   Pre- and post-judgment interest at the lawful rate; and

F.   Any other relief that the Court deems just and proper.

Dated: March 10, 2022

Respectfully submitted,

Megan Snider (SBN LA 33382)
Nora Ahmed* (*pro hac vice forthcoming*)
Bar No. 5092374 (New York)
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St, Ste 2160
New Orleans, LA 70112
Tel: 504-522-0628
msnider@laaclu.org
nahmed@laaclu.org
justicelab@laaclu.org
*Admitted to the New York Bar,
Not admitted to the Louisiana Bar*

Elizabeth M. Raulston *(pro hac vice forthcoming)*
Bar No. 5255138 (New York)
Xuan (Ellen) Gong *(pro hac vice forthcoming)*
Bar No. 5709803 (New York)
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-903-9274
elizabeth.raulston@linklaters.com
ellen.gong@linklaters.com

*Counsel for Plaintiffs, Bruce Washington and
Gregory Lane*