## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BRUCE WASHINGTON, ET AL.**                    CIVIL ACTION

**VERSUS**                                                    No. 22-632

**RANDY SMITH, ET AL.**                                  SECTION I

### ORDER & REASONS

Before the Court is a motion[1] filed by defendants Randy Smith ("Smith"), Jackson Bridel ("Bridel"), Alexander Thomas ("Thomas"), and Shaun Wood ("Wood") to dismiss plaintiffs Bruce Washington ("Washington") and Gregory Lane's ("Lane") second amended complaint.[2] For the reasons that follow, the Court grants the motion in part and denies it in part.

### I.    FACTUAL BACKGROUND

As alleged in the complaint, in the evening of March 13, 2021, defendants Thomas and Wood, both deputies employed by the St. Tammany Parish Sheriff's office ("STPSO"), observed Washington as he pumped fuel at a gas station in Mandeville, Louisiana.[3] Lane was a passenger in Washington's car.[4] After reentering his car, Washington exited the gas station parking lot, and Thomas and Wood followed.[5] After following Washington's car for about a mile, Thomas and Wood

---

[1] R. Doc. No. 33.
[2] R. Doc. No. 29.
[3] *Id.* ¶ 40.
[4] *Id.* ¶ 38.
[5] *Id.* ¶ 43.

activated the lights on their police car.[6] Washington stopped in an empty parking lot.[7]

Thomas and Wood then approached Washington's vehicle on foot, with Thomas on the driver side and Wood on the passenger side.[8] Approximately one minute later, at 8:02 P.M., Bridel arrived in a separate police car, exited his vehicle, and stood approximately ten feet away from Washington's vehicle.[9]

In response to instructions by Thomas, Washington lowered his car window, and Lane slightly opened the passenger-side door of Washington's vehicle, because the passenger-side window would not open.[10] Thomas requested Washington's license, registration, and proof of car insurance.[11] Washington asked why he was being stopped, and Thomas refused to answer until Washington provided him with the requested documentation.[12] Washington complied, and Thomas stated that Washington was stopped for improper turn and failure to use a turn signal.[13] Washington disputed that he had failed to use his turn signal.[14] Thomas disagreed and stated, "The whole time I was watching you."[15]

---

[6] *Id.* ¶ 45.
[7] *Id.* ¶ 46.
[8] *Id.* ¶ 47.
[9] *Id.* ¶ 48.
[10] *Id.* ¶ 49.
[11] *Id.* ¶ 51.
[12] *Id.* ¶¶51–52.
[13] *Id.* ¶ 53.
[14] *Id.* ¶ 54.
[15] *Id.*

On the passenger side of the car, Lane asked Wood if he could retrieve his phone and call his wife, who would then call their lawyer, since he had been advised that he should do so if he was stopped by the police.[16] Wood asked Lane if he thought he was in trouble or going to jail, and Lane responded that he did not, but still wished to call his wife.[17] Wood then instructed Lane to get out of the car, directed him to stand near Wood and Thomas' police car, and asked for Lane's identification.[18] Lane complied.[19] Lane then asked Wood why he had been asked to get out of the car. Wood laughed and stated that Lane was "acting a little weird" by requesting permission to make a phone call.[20]

Thomas meanwhile continued to question Washington, who remained in the car.[21] Thomas asked Washington where they were going, and Washington responded by asking what that question had to do with the traffic stop and stating that he knew his legal rights.[22] Thomas responded that Washington was going to make the stop "go a different way than it has to be."[23] Thomas then asked Washington to exit the vehicle, and Washington complied.[24]

---

[16] *Id.* ¶ 57.
[17] *Id.* ¶¶ 58–59.
[18] *Id.* ¶ 60.
[19] *Id.* ¶ 61.
[20] *Id.* ¶ 62.
[21] *Id.* ¶ 63.
[22] *Id.* ¶ 64.
[23] *Id.* ¶ 65.
[24] *Id.* ¶¶ 66–67.

Bridel then moved nearer the other officers and stood behind Thomas.[25] Thomas asked Washington if Washington had any weapons, and Washington stated that he did not.[26] Thomas asked Washington if he would mind if Thomas patted him down, and Washington did not respond.[27] Thomas frisked Washington and did not find any weapons.[28] He then ordered Washington to stand by Lane near the police car.[29]

Lane asked the officers why they had not stopped a speeding vehicle with no taillights that Lane and Washington had observed just before they were stopped.[30] Wood responded that they "can't catch everybody."[31] Lane again asked if he could retrieve his phone and call his wife.[32] Thomas shouted that Lane was not permitted to call his wife and told him to stop talking.[33] Wood then grabbed Lane's elbow and asked if he could pat him down; Lane acquiesced, and informed Wood that he had a pocketknife, which Wood located and placed on the passenger seat of the police car.[34]

Thomas then took both Lane's and Washington's IDs to the police car and entered their information into his laptop.[35] Wood retrieved the ticket book from the police car's trunk, sat in the police car with Thomas, and asked Thomas what

---

[25] *Id.* ¶ 67.
[26] *Id.* ¶ 68.
[27] *Id.* ¶¶ 70–71.
[28] *Id.* ¶ 73.
[29] *Id.*
[30] *Id.* ¶ 76.
[31] *Id.*
[32] *Id.*
[33] *Id.* ¶ 77.
[34] *Id.* ¶ 78.
[35] *Id.* ¶ 80.

violation information should be written on the ticket.[36] Thomas responded that Washington should be cited "at least" for taking an improper turn and failing to use his turn signal, but told Wood to "standby [sic]" instead of writing the ticket immediately.[37]

At approximately 8:06 P.M., Thomas radioed the police dispatcher and requested that Washington's and Lane's names be run through the police database for Bogalusa and Washington Parishes.[38] At approximately 8:07 P.M., Wood told Thomas he was going to step out of the police car, and he did so.[39]

At 8:10 P.M., the radio dispatcher informed Thomas that Lane's record was clear, but that Washington had a traffic-related offense open in Bogalusa, Louisiana.[40] Thomas informed Washington of this information, and then accused Washington of not listening to him.[41] Thomas then instructed Wood to write the traffic citation.[42]

Washington was surprised to hear about the Bogalusa warrant, as he had recently been to court to address it.[43] He asked if he could retrieve related paperwork from his car, which would show that the warrant was closed.[44] Washington took a

---

[36] *Id.* ¶¶ 81, 83.
[37] *Id.* ¶ 84.
[38] *Id.* ¶ 85.
[39] *Id.* ¶¶ 86–87.
[40] *Id.* ¶ 88.
[41] *Id.* ¶¶ 89, 91.
[42] *Id.* ¶ 91.
[43] *Id.* ¶ 90.
[44] *Id.* ¶ 93.

step toward his vehicle, and Thomas shouted that Washington was not allowed to return to the vehicle.[45]

At 8:13 P.M., Wood began to write the traffic citation while Thomas walked around Washington's vehicle, looking inside with his flashlight.[46] Wood then asked Thomas whether Thomas would write Thomas' name on the citation.[47] Thomas responded "No, why?" and Wood laughed and said "It's your beat, man."[48] Thomas replied, "No, that's you," and told Wood to put Wood's name on the ticket.[49] Wood shook his head and stated "that's fucked."[50] Wood finished writing the traffic citation at 8:18 P.M.[51] Wood's was the only law enforcement name that appeared on the traffic citation.[52] Washington signed the citation at 8:19 P.M. After returning both Lane's and Washington's IDs, the stop concluded at 8:21 P.M.[53]

On March 15, 2021, Washington and Lane attempted to file a misconduct complaint against the defendants at the St. Tammany Parish Sheriff's office in Covington, Louisiana.[54] Employees there, identified as "Doe Defendants" in the complaint, allegedly refused to assist Washington and Lane.[55] One employee told plaintiffs "we don't do that here," and instructed them to go to an address in

---

[45] *Id.* ¶¶ 93−94.
[46] *Id.* ¶¶ 96, 98.
[47] *Id.* ¶ 99.
[48] *Id.*
[49] *Id.*
[50] *Id.* ¶ 100.
[51] *Id.* ¶ 102.
[52] *Id.* ¶ 101.
[53] *Id.* ¶ 105.
[54] *Id.* ¶ 106.
[55] *Id.* ¶ 107.

Mandeville, Louisiana.[56] Upon arriving at that address, Washington and Lane found that it was shuttered.[57] Washington and Lane proceeded to a different office that Lane recalled seeing in Mandeville.[58] Staff at that location also did not assist them in filing a complaint.[59] Washington and Lane allege that "all [St. Tammany Parish Sheriff's Office ("STPSO")] employees [they] encountered met them with contempt and derision."[60]

Washington and Lane further allege that, on March 15, 2021, STPSO employee Crystal Dill emailed another STPSO employee, Emile Lubrano, informing Lubrano that Washington was upset that he had not been provided a complaint form.[61] Dill told Washington that Lubrano would call him the morning of March 16, the next day.[62] Lubrano forwarded Dill's email to Christopher Graham and David Maki, also STPSO employees, and directed Graham to call Washington the evening of March 17.[63] According to Washington, no one from the sheriff's office ever contacted him, and no STPSO employee ever investigated Washington's complaints.[64] The office's internal affairs log contains no record of Washington's attempt to report.[65]

---

[56] *Id.* ¶ 111.
[57] *Id.* ¶ 112.
[58] *Id.* ¶ 113.
[59] *Id.*
[60] *Id.* ¶ 116.
[61] *Id.* ¶ 117.
[62] *Id.*
[63] *Id.* ¶ 118.
[64] *Id.* ¶¶ 119−120.
[65] *Id.* ¶¶ 121.

The complaint also sets forth allegations that the individual defendants discriminated against Washington and Lane, both of whom are African American, based on their race.[66] The complaint also alleges that Lane suffers from anxiety and emotional distress as a result of the incident.[67] It also alleges that Washington fears reoccurrence of a similar event, which "hinders his ability to move about freely and travel to see his family."[68]

Plaintiffs assert seven causes of action. First, both Washington and Lane assert that Thomas and Wood unlawfully extended the traffic stop in violation of the Fourth Amendment and 42 U.S.C. § 1983. Second, Lane asserts that Bridel, Thomas, and Wood unlawfully detained him in violation of the Fourth Amendment and § 1983, and in violation of Section 5 of the Louisiana Constitution. Third, Washington and Lane assert that Thomas and Wood unlawfully retaliated against them for engaging in constitutionally protected speech, in violation of the First Amendment and § 1983. Fourth, Washington asserts that Thomas unlawfully searched him in violation of the Fourth Amendment and § 1983. Fifth, Washington and Lane assert that the Doe defendants at the St. Tammany's Parish Sheriff's offices violated their rights guaranteed by the First Amendment's Petitions Clause and § 1983.[69] Sixth, Washington and Lane assert that Randy Smith violated their Fourth and Fifth Amendment rights by maintaining unconstitutional policies and practices in his

---

[66] *Id.* ¶¶ 126−135.
[67] *Id.* ¶¶ 136−138.
[68] *Id.* ¶¶ 139−141.
[69] The Doe defendants have been neither identified nor served. Defendants therefore did not seek dismissal of that claim.

capacity as St. Tammany Parish Sheriff. Seventh, and finally, Washington and Lane assert that Smith violated 42 U.S.C. § 2000(d), Title VI of the Civil Rights Act of 1964, because he engaged in racial discrimination as sheriff while receiving federal funds. Thomas, Lane, and Wood are sued in their individual capacities, and Smith is sued in his official capacity.

## II.        STANDARDS OF LAW

### a.  Dismissal for Failure to State a Claim

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotations omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Culbertson v. Lykos*, 790 F.3d 608, 616 (5th Cir. 2015) (citation omitted) (internal quotation marks omitted).

A complaint is insufficient if it contains "only labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citation and internal quotations omitted). It "must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon

which it rests." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (internal quotations omitted). In considering a motion to dismiss, a court views the complaint "in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in the plaintiff's favor." *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004).

A 12(b)(6) motion "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). In other words, a defendant must make a 12(b)(6) motion before filing an answer to the complaint. When a defendant makes a 12(b)(6) motion after time for raising that motion has expired, courts may treat that motion as a 12(c) motion for judgment on the pleadings. *Cox v. Richards*, 761 F. App'x 244, 247 (5th Cir. 2019); *accord Waldman v. Scottsdale Ins. Co.*, 07–9533, 2008 WL 2967626, at *1 (E.D. La. July 31, 2008) (Africk, J.) Rule 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). "The standard for deciding a Rule 12(c) motion is the same standard used for deciding motions to dismiss pursuant to Rule 12(b)(6)." *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 256 (5th Cir. 2022).

### b. Qualified Immunity

"Governmental officers sued in their individual capacity are entitled to qualified immunity insofar as their conduct 'did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Schmidt v. Stassi*, 250 F. Supp. 3d 99, 102 (E.D. La. 2017) (Africk, J.) (quoting *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Under the law of qualified immunity, a governmental officer may commit a constitutional violation but nevertheless be immune from suit if it was not "clearly established," at the time that he acted, that he was acting unconstitutionally. *See Pearson v. Callahan*, 555 U.S. 223, 240 (2009) (noting that a court may "hold[ ] that a defendant committed a constitutional violation[,] but [also hold] that the violation was not clearly established").

"Once a defendant invokes the qualified immunity defense, the plaintiff carries the burden of demonstrating its inapplicability." *Floyd v. City of Kenner*, 351 F. App'x 890, 893 (5th Cir. 2009) (citing *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009)). To overcome qualified immunity, a plaintiff must show two things: first, that the defendant violated their constitutional rights and, second, "that the right at issue was 'clearly established' at the time of the alleged misconduct." *Salazar v. Molina*, 37 F.4th 278, 281 (5th Cir. 2022). A court may consider the two elements of the qualified immunity analysis in whichever order it chooses. *Schmidt*, 250 F. Supp. 3d at 102 (citing *Pearson*, 555 U.S. 223, 236).

"Clearly established law is not to be defined at a high level of generality." *Tucker v. City of Shreveport*, 998 F.3d 165, 174 (5th Cir. 2021). To show that a right was "clearly established" at the time of the alleged conduct, the plaintiff must show that the right was "so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah, Okla., v. Bond*, 142 S. Ct. 9, 11 (2021) (citation and quotation omitted). The plaintiff must "identify precedent placing the constitutional question 'beyond debate' such that the

answer would immediately be apparent to every reasonable officer." *Salazar*, 37 F.4th at 286 (quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021)). "The plaintiff has the burden to point out the clearly established law." *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019).

"At the motion-to-dismiss stage, the Court looks to 'defendant's conduct as alleged in the complaint' to determine whether a defendant is entitled to qualified immunity." *Nevarez v. Coleman*, No. 21-1855, 2022 WL 2528237, at *4 (E.D. La. July 7, 2022) (Vance, J.) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)).

## III.   ANALYSIS

### a.  Conversion to 12(c) Motion for Judgment on the Pleadings

Defendants' motion to dismiss is technically untimely, as it was filed after they filed an answer to plaintiffs' amended complaint.[70] Plaintiffs noted this in their opposition to the instant motion,[71] but stated that they were not opposed to the Court treating the motion as a 12(c) motion for judgment on the pleadings.[72] Defendants requested that the Court construe their motion to dismiss as a 12(c) motion in their reply in support of their motion.[73] The Court will do so, applying "the same standard

---

[70] Defendants filed their answer on August 26, 2022, R. Doc. No. 30, and filed the instant motion to dismiss on September 7, 2022, R. Doc. No. 33.

[71] R. Doc. No. 38, at 4 n.2.

[72] *Id.*

[73] R. Doc. No. 41, at 3. Also in their opposition, defendants assert that the Court cannot consider the information allegedly contained in the body camera footage or STPSO Budget Book because plaintiffs did not attach either the footage or the Budget Book to the complaint. Both the footage and the Budget Book, however, are referenced throughout the complaint, and, at this procedural stage, the Court must "accept[ ] as true all well-pleaded factual allegations." *Lovick*, 378 F.3d at 437. Accordingly, for purposes of this order, the Court assumes that the footage and the Budget Book

used for deciding motions to dismiss pursuant to Rule 12(b)(6)." *Q Clothier New Orleans, L.L.C.*, 29 F.4th at 256.

### b. Extension of Traffic Stop (Washington and Lane Against Thomas and Wood)

Washington and Lane allege that Thomas and Wood violated their rights guaranteed by the Fourth Amendment by detaining them longer than was necessary to investigate the alleged traffic violation and issue the citation.[74] Plaintiffs argue that the following conduct by Thomas and Wood was impermissible: (1) running a warrant check on Lane, the passenger,[75] (2) refusing to allow Washington to return to his car to retrieve paperwork showing that the Bogalusa warrant was in fact closed,[76] and (3) walking around the car and looking inside it with a flashlight.[77] Plaintiffs allege that the officers "lacked reasonable suspicion of additional criminal activity" justifying these actions.[78]

Defendants argue that plaintiffs have failed to state a claim for relief on this cause of action, pointing to the discovery of Washington's outstanding warrant, and that the stop totaled twenty minutes, which defendants argue is not an unreasonable amount of time.[79] Defendants also argue that arguments regarding walking around

---

contain the information that the complaint attributes to them. To the extent that the plaintiffs' opposition references any information not included in the complaint, that information would be disregarded. However, neither the footage nor the Budget Book figure prominently in the Court's analysis.

[74] R. Doc. No. 29, ¶¶ 142–153.

[75] R. Doc. No. 38, at 22 (citing R. Doc. No. 29, ¶ 85).

[76] *Id.* (citing R. Doc. No. 29, ¶¶ 88–94).

[77] *Id.* (citing R. Doc. No. 29, ¶ 99)

[78] R. Doc. No. 29, ¶ 147.

[79] R. Doc. No. 33-1, at 14.

the car with a flashlight are not supported by the allegations in the complaint.[80]
Defendants also assert that they are entitled to qualified immunity on this claim.[81]

A § 1983 claim for unlawful extension of a traffic stop is evaluated according to the standards enumerated in *Terry v. Ohio*, 392 U.S. 1 (1968). A police officer may initiate a traffic stop if he has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation" has occurred. *United States v. Bams*, 858 F.3d 937, 942 (5th Cir. 2017). During a traffic stop, an officer may order both the driver and passengers to step out of the car "pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

After the initial stop, the officer's actions must be "reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place," and the "stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, articulated by reasonable facts, emerges." *Bams*, 858 F.3d at 942 (quoting *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010); *accord United States v. Burgos-Coronado*, 970 F.3d 613, 619 (5th Cir. 2020).

---

[80] R. Doc. No. 41, at 8.
[81] R. Doc. No. 33-1, at 15.

There is "no constitutional stopwatch on traffic stops." *United States v. Brigham*, 482 F.3d 500, 511 (5th Cir. 2004). "The constitutionally tolerable duration of any seizure 'is determined by the seizure's mission.'" *United States v. Portillo-Saravia*, 379 F. Supp. 3d 600, 613 (S.D. Tex. 2019) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). The mission of a traffic stop is "to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citation omitted).

The Court first addresses whether plaintiffs have alleged a violation of their constitutional rights. Plaintiffs assert that it was impermissible to run a warrant check for Lane without additional reasonable suspicion against him, as he was the passenger and not the driver.[82] The Fifth Circuit has held that, during a traffic stop, it is permissible for an officer to "ask a passenger . . . to identify himself and to run computer checks on his driver's license and background." *Pack*, 612 F. 3d at 351, *modified on rehearing*, 622 F. 3d 383 (5th Cir. 2010); *accord United States v. Parker*, No. 13–205, 2015 WL 2229272, at *4 (E.D. La. May 12, 2015) (Morgan, J.) ("During [a traffic stop], an officer may . . . ask the occupants for identification and run a computer check for outstanding warrants."). Accordingly, the Court concludes that the officers did not impermissibly extend the traffic stop by checking if Lane had outstanding warrants.

Plaintiffs assert that it was impermissible for Thomas and Wood to prevent Washington from returning to his car to retrieve paperwork showing that the

---

[82] R. Doc. No. 38, at 16 & n.6.

Bogalusa warrant was resolved. As stated above, an officer is allowed to prolong a stop on the basis of newly formed reasonable suspicion "until the officer has dispelled" that suspicion. *Burgos-Coronado*, 970 F.3d at 619. In considering whether a traffic stop was unconstitutionally prolonged, a court must consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Brigham*, 382 F.3d at 511. Plaintiffs do not argue that an apparently open warrant against a driver is not a basis for reasonable suspicion. Instead, plaintiffs argue that Thomas and Wood impermissibly extended the stop by "refus[ing] to receive evidence that would dispel" the suspicion aroused by the discovery of an apparently open warrant against Washington.[83]

The Court doubts whether refusing to allow Washington to return to his car to retrieve paperwork amounts to an unconstitutional lack of diligent investigation. In particular, the Court notes that, as officers are permitted to order occupants out of a car during a traffic stop—even without additional reasonable suspicion—it stands to reason that an officer may prohibit an occupant from returning to the vehicle once further reasonable suspicion—here, in the form of an apparently open warrant against the driver—has materialized. *See Maryland*, 519 U.S. at 414–15. Additionally, as "[t]raffic stops are especially fraught with danger to police

---

[83] *Id.* at 17.

officers . . . certain negligibly burdensome precautions" may be justified to ensure safety. *Rodriguez*, 575 U.S. at 356.

As defendants have invoked qualified immunity, however, the Court need not decide whether defendants' actions actually violated the Fourth Amendment. *See Schmidt*, 250 F. Supp. 3d at 102. Plaintiffs have not identified case law clearly establishing that Thomas and Wood's conduct violated plaintiffs' constitutional rights, and therefore have not overcome qualified immunity. *Clarkston*, 943 F.3d at 993; *Floyd*, 351 F. App'x at 893.

Plaintiffs point to *Emesowum v. Cruz*, 756 F. App'x 374 (5th Cir. 2018), in which the plaintiff was stopped by police on suspicion of breaking into a car, placed in handcuffs, and detained for twenty minutes even though the officers "knew shortly after handcuffing" him that he owned the car. *Id.* at 379. The Fifth Circuit determined that the officers' conduct was unreasonable and violated the Fourth Amendment because they detained the plaintiff after their reasonable suspicion had been dispelled. *Id.* While this case clearly stands for the proposition that officers may not extend traffic stops beyond the time necessary to dispel reasonable suspicion, it does not "plac[e] the constitutional question" of whether Thomas and Wood were required to allow Washington to return to his vehicle to retrieve the paperwork "beyond debate." *Salazar*, 37 F.4th at 286.

Plaintiffs also cite *United States v. Brigham* in an attempt to defeat qualified immunity. In that case, the Fifth Circuit determined that an officer did not unconstitutionally prolong a traffic stop when he asked the car's occupants about

their travel plans before asking for their identification or checking the car's registration. 382 F.3d at 504. This case does not establish that the defendants were constitutionally required to allow Washington to return to his car to retrieve paperwork regarding the Bogalusa warrant.

Finally, plaintiffs argue that Thomas violated plaintiffs' rights when Thomas extended the traffic stop by walking around the car and shining a flashlight inside it after the citation had been issued. The Court is puzzled by this assertion, as the complaint states that Thomas performed the walkaround "*[w]hile* Defendant Wood wrote the traffic citation."[84] The Court declines to address plaintiffs' argument on this point, as it was not in fact alleged in the complaint.

In sum, the Court concludes that Thomas and Wood did not violate the plaintiffs' rights by extending the traffic stop. Alternatively, Thomas and Wood are entitled to qualified immunity. Plaintiffs' claim for unlawful extension of the traffic stop will be dismissed.

### c. Unlawful Seizure in Violation of the Fourth Amendment and Louisiana Constitution (Lane Against Bridel, Thomas, and Wood)

Lane asserts that Bridel, Thomas, and Wood violated his rights, guaranteed by both the Fourth Amendment to the U.S. Constitution and the Louisiana Constitution, to be free of unreasonable seizure.[85]  The Court first addresses the alleged federal constitutional violation.

---

[84] R. Doc. No. 29, ¶ 98 (emphasis added).
[85] R. Doc. No. 30, ¶¶154–181.

Plaintiffs claim that the individual defendants lacked reasonable suspicion justifying the seizure of Lane beyond the initial traffic stop, which they allege took the form of "searching [him], confiscating his identification, yelling at him, grabbing his elbow without consent, ordering him to stand in and place his hands in specific locations, continuously denying him the use of his cellphone and detaining him to run computer and dispatch checks on his record."[86] Defendants argue that these allegations do not state a claim for violation of the Fourth Amendment; in the alternative, they also assert that they are entitled to qualified immunity.[87]

The Court first addresses whether plaintiffs have sufficiently alleged a constitutional violation. First, as discussed in the previous section, the Court agrees with the defendants that taking Lane's identification and running a warrant check on him was within the scope of the initial traffic stop. *Pack*, 612 F. 3d at 351; *Parker*, 2015 WL 2229272, at *4. Defendants therefore did not need additional reasonable suspicion against Lane in order to justify these actions.

Defendants do not dispute, however, that the other conduct alleged in the complaint—searching Lane's person, touching his elbow, ordering him to stand in and place his hands in specific locations, and preventing him from accessing his cellphone—are additional seizures outside the scope of the initial traffic stop. Because these actions were not necessary to effectuate the purpose of the stop (that is, to investigate the alleged traffic violation), they must be justified by additional

---

[86] *Id.* ¶¶ 177–178.
[87] R. Doc. No. 33-1, at 16–18.

reasonable suspicion of wrongdoing against Lane. *See Pack*, 612 F.3d at 350. Defendants argue that they had the requisite reasonable suspicion based on the discovery of Washington's apparently open warrant, and Wood's belief that Lane was "acting weird."[88] Defendants also argue that Lane consented to the search of his person.[89]

The Court addresses defendants' arguments regarding the existence of reasonable suspicion. The existence of reasonable suspicion is an objective inquiry, and the officers' suspicion must be supported by "articulable facts." *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015). Nervousness, hesitance to answer officers' questions, and evasive or strange answers to questions are relevant factors in the development of reasonable suspicion. *United States v. Rodriguez*, 802 F. App'x 90, 97 (5th Cir. 2020). But nervousness alone generally does not create reasonable suspicion of wrongdoing, as nervousness is a "natural reaction to police presence." *United States v. Monsivais*, 848 F.3d 353, 359 (5th Cir. 2017) (internal quotations and citations omitted).

The complaint states that Wood believed Lane was "acting weird" in part because he wished to call his wife so that she could tell their lawyer that he had been stopped.[90] As plaintiffs point out, the Fifth Circuit has held that use of a cell phone, in and of itself, does not create reasonable suspicion of wrongdoing. *Johnson*, 887 F.3d at 734 ("[T]he mere use of a cell phone does not establish a reasonable suspicion of

---

[88] *Id.* at 16.
[89] *Id.* at 17.
[90] R. Doc. No. 29, ¶ 62.

criminal activity."). If the use of a cell phone is not a basis for reasonable suspicion of criminal activity, it is not clear why the desire to use a cell phone would be. Other than Lane's desire to call his wife, defendants have not pointed to any other "articulable facts" supporting Wood's belief that Lane was "acting weird." *Castillo*, 804 F.3d at 367. Accordingly, the Court concludes that Lane's allegedly "weird" or nervous behavior, and his desire to make a phone call, do not on their own establish a basis for reasonable suspicion.

Defendants also point to the allegedly outstanding warrant against Washington and the fact that Lane had a pocketknife on his person at the time of the stop.[91] The Court is not convinced that these circumstances support reasonable suspicion justifying further seizures of Lane. It is not clear why Washington's traffic-related warrant would arouse reasonable suspicion that Lane was engaged in wrongdoing. Further, Lane alerted the officers to the presence of the pocketknife before being searched.[92]

Defendants also argue that Lane consented to the search of his person.[93] The complaint states that Lane "acquiesced" to a pat down.[94] Plaintiffs argue that any consent given by Lane was coerced and therefore ineffective.[95] "Consent is valid only if voluntary." *United States v. Gomez-Moreno*, 479 F.3d 350, 357 (5th Cir. 2007),

---

[91] R. Doc. No. 33-1, at 17.
[92] R. Doc. No. 29, ¶ 78.
[93] R. Doc. No. 33-1, at 17.
[94] R. Doc. No. 29, ¶ 78.
[95] R. Doc. No. 38, at 21.

*overruled on other grounds by Kentucky v. King*, 563 U.S. 451 (2011). To determine if consent is voluntary, the Fifth Circuit considers six factors:

> 1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found.

*United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002). No factor is determinative. *United States v. Guidry*, No. 18-414, 2018 WL 6725372, at *3 (E.D. La. Dec. 21, 2018) (Ashe, J.) (citing *United States v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993)). Defendants do not address these factors, simply pointing out that plaintiffs have not alleged that "Lane [ever] verbally stated that he did not consent" to the pat down.[96]

Viewing the facts alleged in the complaint in the light most favorable to Lane, three factors weigh in favor of finding that his consent was voluntary: Lane was largely cooperative with the officers,[97] and "there is nothing in the record showing that he lacked the requisite education or intelligence to give valid consent," nor that he believed any incriminating evidence would be found as a result. *Jamison v. McClendon*, 476 F. Supp. 3d 386, 412 (S.D. Miss. 2020). However, Lane's custodial status was not voluntary, and he "believ[ed] he was not free to decline" Wood's

---

[96] R. Doc. No. 33-1, at 17.
[97] R. Doc. No. 29, ¶ 49 (stating that Washington and Lane "complied" with Thomas' instructions to open the passenger-side door); ¶ 61 ("Lane complied with all requests.").

request.[98] Lane also argues that Wood's actions were coercive because he touched Lane's elbow without his consent.[99]

Because defendants have invoked qualified immunity, the Court need not definitively answer the question of whether the individual defendants violated Lane's rights, so long as plaintiffs have not pointed to any case law clearly establishing a violation of the plaintiffs' rights. *Schmidt*, 250 F. Supp. 3d at 102. They have not done so.

First, as stated above, much of the alleged behavior, including ordering Lane out of the car, taking his ID, and running a warrant check, simply did not require additional reasonable suspicion. And though the Court agrees that Lane's behavior, as alleged in the complaint, fails to provide a basis for reasonable suspicion, plaintiffs have not pointed to any case law that places "beyond debate" the question of whether the totality of the circumstances, including the apparent open warrant against Washington, Lane's desire to call his wife, and the time of day, justified the officers' choice to continue to detain Lane during the traffic stop.

Finally, regarding the search of Lane's person, the complaint states that Lane "acquiesced to the frisk." Plaintiffs point to *Jones v. City of Burkburnett*, a district court case, as establishing "that consent cannot nullify a Fourth Amendment violation if it is coerced."[100] 173 F. Supp. 2d 583 (N.D. Tex. 2001). In that case, however, the court concluded that the plaintiff had adequately alleged coercion when

---

[98] *Id.* ¶ 70.
[99] R. Doc. 38, at 21.
[100] *Id.* at 29.

the complaint stated that the defendants "sprayed mace into [her] eyes in order to coerce her into consenting to a strip search." *Id.* at 588. Plaintiffs have not alleged such egregious actions here.

Plaintiffs also point to *Jamison v. McClendon*, another district court case, in which the court determined that "there was a genuine factual dispute about whether [the plaintiff] voluntarily consented to the search" when the officer asked five times for consent to search the plaintiff's car, talked about officers "planting stuff" in people's cars, and placed his hands in the car. 476 F. Supp. at 413. These cases, setting aside their lack of precedential value, do not clearly establish that the officers' actions here would be considered coercive for Fourth Amendment purposes.

Accordingly, the Court concludes that, even if the individual defendants lacked reasonable suspicion justifying the additional seizures of Lane, and that Lane did not validly consent, Bridel, Thomas, and Wood are entitled to qualified immunity. Lane's claim for unlawful seizure under the Fourth Amendment will therefore be dismissed, as plaintiffs have not met their burden to point out case law clearly establishing that defendants' acts violated Lane's constitutional rights.

Lane has also asserted a claim for unlawful seizure in violation of Article I, Section 5 of the Louisiana Constitution, which "protects against unreasonable searches and seizures and, is, therefore, analogous to the federal Fourth Amendment." *May v. Strain*, 55 F. Supp. 3d 885, 901 (E.D. La. 2014) (Brown, J.). "Louisiana applies qualified immunity principles to state constitutional law claims based on '[t]he same factors that compelled the United States Supreme Court to

recognize a qualified good faith immunity for state officers under § 1983.'" *Smallwood ex rel. T.M. v. New Orleans City*, No. 15-1887, at 2015 WL 5944374, \*7 (E.D. La. Oct. 13, 2015) (Barbier, J.) (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 296 (5th Cir. 2005)). Therefore, because Lane's federal constitutional claim fails to overcome qualified immunity, his state claim fails on the same ground. *Id.* ("Inasmuch as Plaintiff's claims under state constitutional law parallel entirely the section 1983 allegations, Plaintiff fails to state a claim against [defendant] sufficient to overcome qualified immunity."); *May*, 55 F. Supp. 3d at 901 (dismissing claims pursuant to La. Const. art. I § 5 because plaintiffs "failed to demonstrate that Officer Defendants are not entitled to the defense of qualified immunity as to their claims under § 1983").[101]

### d. First Amendment Retaliation (Washington and Lane Against Thomas and Wood)

Both Washington and Lane assert that Thomas and Wood unlawfully retaliated against them for exercise of their First Amendment rights during the traffic stop.[102] Specifically, Washington alleges that Thomas retaliated against him by saying that he was "going to make [the traffic stop] go a different way than it has to be," ordering Washington out of the vehicle, frisking him, and prolonging the traffic

---

[101] Lane also sought punitive damages with regard to his unlawful seizure claim. R. Doc. No. 29, ¶ 181. Defendants argue that Lane failed to state a claim for punitive damages because he did not plausibly allege that the defendants' conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Woodward v. Lopinto*, No. 18-4236, 2021 WL 1969446 at \*9 (E.D. La. May 17, 2021) (Lemmon, J.) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Because the Court dismisses Lane's claim, it does not address the parties' arguments regarding punitive damages.

[102] R Doc. No. 29, ¶¶ 182–200.

stop.[103] Lane alleges that Wood retaliated against him by asking for Lane's identification and ordering him out of the vehicle, that Thomas retaliated against him by yelling at him to "stop talking,"[104] and that both retaliated by restricting his movements and preventing him from making a phone call.[105]

To state a claim for First Amendment retaliation, a plaintiff must allege that (1) the plaintiff engaged in activity protected by the First Amendment, (2) the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in" the activity, and (3) the defendant's "actions were substantially motivated against" the plaintiff's protected activity. *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017). "[A] retaliation claim requires some showing that the plaintiffs' exercise of free speech has been curtailed." *Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002). However, "since there is no justification for harassing people for exercising their constitutional rights" the alleged harm "need not be great in order to be actionable." *Id.* (quotation and citation omitted).

As Lane's and Washington's First Amendment claims are based on separate factual allegations, the Court addresses each individually. Defendants have asserted

---

[103] *Id.* ¶¶ 187–188.
[104] *Id.* ¶ 195.
[105] *Id.* ¶ 196.

26

that they are entitled to qualified immunity with respect to both Washington's and Lane's claims.

### i. Washington's Claim

Washington alleges that he engaged in protected conduct when he asked Thomas why he had been stopped,[106] and that Thomas retaliated by telling Washington that he was going to "make [the stop] go a different way than it has to be,"[107] and by ordering Washington out of the vehicle, frisking him, and allegedly delaying the stop.[108]

The Court first examines whether any constitutional violation was "clearly established" at the time of the defendants' conduct. *Salazar*, 37 F.4th at 281. Washington's claim is based in part on conduct that the Court has already determined was permissible within the scope of the traffic stop. Plaintiffs have pointed to no case law establishing that a First Amendment retaliation claim may be based on conduct justified under the Fourth Amendment. Plaintiffs rely on *Keenan v. Tejeda*, in which police officers stopped the plaintiffs' car, held them at gunpoint, and detained them for over half an hour, but ultimately issued a citation "for driving without a rear license-plate light." 290 F.3d 252, 257. The plaintiffs in *Keenan* alleged that these actions were motived by plaintiffs' exposure of improper practices in the local constable's office. *Id.* at 256. Plaintiffs also rely on *Rolf v. City of San Antonio*, 77 F.3d 823 (5th Cir. 1996), in which the Fifth Circuit denied qualified immunity to city

---

[106] *Id.* ¶ 186.
[107] *Id.* ¶ 187.
[108] *Id.* ¶ 188.

officials who allegedly sought to condemn the plaintiffs' land in retaliation for plaintiffs' opposition to a proposed reservoir development. *Id.* at 826.

Neither of these cases clearly establish that defendants' conduct in this case was unconstitutional. While the Court agrees that telling Washington that he was going to "make [the stop] go a different way than it has to be,"[109] might reasonably cause Washington not to verbally respond, this conduct is not nearly so egregious as the conduct undertaken by defendants in *Keenan* and *Rolf*. Moreover, neither case even addresses whether a First Amendment retaliation claim may be premised on defendants' actions that were within the Fourth Amendment scope of a traffic stop—here, ordering Washington out of the car, and the conduct alleged to have prolonged the stop. Accordingly, the Court concludes that Washington has failed to overcome qualified immunity as to his First Amendment retaliation claim.

### ii. Lane's Claim

Lane alleges that he engaged in protected speech when he asked Wood if he could call his wife, and that Wood retaliated by ordering Lane out of the vehicle and asking for his identification.[110] Lane also alleges that he engaged in protected speech by asking why he was being subjected to further questioning and detention, and that Wood retaliated by yelling at him to "stop talking," and by preventing Lane from using his cellphone.[111] Defendants do not dispute that Lane engaged in protected conduct. Instead, they argue that ordering Lane out of the car and asking for

---

[109] *Id.* ¶ 187.

[110] *Id.* ¶¶ 193–194.

[111] *Id.* ¶¶ 195–196.

identification does not amount to retaliation, because it was a search justified by the initial traffic stop,[112] and that Lane has not alleged that Wood's responses caused him to forgo any constitutionally protected activity.

As with Washington's claim, Lane's claim is precluded by qualified immunity. Plaintiffs point to the same cases discussed above—*Keenan* and *Rolf*—as establishing that defendants' conduct was unconstitutional. However, as discussed above, neither of these cases involved conduct analogous to that alleged here. Accordingly, the Court concludes that Lane's First Amendment claim likewise cannot overcome qualified immunity.

### e. Unlawful Search Under the Fourth Amendment (Washington Against Thomas)

Washington alleges that Thomas unlawfully searched him and thereby violated his rights guaranteed by the Fourth Amendment.[113] Washington alleges that there was no legal basis for searching Washington's person, and that Washington was coerced into acquiescing to the search and therefore did not validly consent.[114] Defendants argue that Washington has failed to state a claim for relief on this cause of action because (1) the frisk was justified under the circumstances, as the stop took place at night and Washington and Lane were "uncooperative," and (2) Washington

---

[112] R. Doc. No. 33-1, at 21.
[113] R. Doc. No. 29, ¶¶ 201–209.
[114] *Id.* ¶¶ 204–205.

submitted to and did not object to the search.[115]   Defendants also invoke qualified immunity.

In order to justify the frisk of Washington, Thomas must have had reasonable suspicion that Washington was armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009); *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977). Reasonable suspicion is to be "determined by looking to 'the totality of the circumstances—the whole picture.'" *United States v. Jordan*, 232 F.3d 447, 449 (5th Cir. 2000) (quoting *United States v. Sokolow*, 490 U.S. 1, 7–8 (1989)).

The Court first considers whether Washington has alleged a constitutional violation. Though defendants point to the facts that "the traffic stop took place at night . . . and involved both an uncooperative driver and passenger" as circumstances supporting the frisk, they do not point to any case law that suggests that these circumstances, without more, support reasonable suspicion justifying the search of Washington.[116] Moreover, based on the facts alleged in the complaint, it is difficult to see how either Washington or Lane was uncooperative, as both complied with the officers' directions.[117] Second, while "a person's presence in a high crime area at night is relevant" to a determination of reasonable suspicion, "it is not in and of itself

---

[115] R. Doc. No. 33-1, at 24.

[116] Defendants cite to *United States v. Brown*, a case in which the Fifth Circuit determined that officers had reasonable suspicion that individuals were armed and dangerous when they "slump[ed] down in their seats" and appeared to be "conceal[ing] something underneath their seats" when the officers approached the car. 209 F. App'x 450, 453 (2006).

[117] As alleged in the complaint, prior to the frisk, Washington had provided his license, registration, and insurance, R. Doc. No. 29, ¶ 53, and complied with the officers' direction to exit the vehicle, *id.* ¶ 66–67.

enough to support an officer's decision to stop or frisk." *United States v. Hill*, 752 F.3d 1029, 1035–36 (5th Cir. 2014). Here, neither party indicates that Washington and Lane were stopped in a "high crime area," and the mere fact that the stop occurred at night cannot support reasonable suspicion. *See id.*

In their reply in support of their motion, defendants also point to the fact that Thomas believed Washington had an outstanding warrant.[118] The fact that Washington had a *traffic-related* warrant apparently outstanding against him does not in and of itself support reasonable suspicion that he was armed or dangerous. Accordingly, the Court concludes that Thomas lacked reasonable suspicion justifying the frisk of Washington.[119]

A frisk that is not justified by reasonable suspicion may nevertheless be constitutional if it is consented to. *Gomez-Moreno*, 479 F.3d at 354. The complaint alleges that, when asked whether Washington would mind if Thomas patted him down, "Washington said nothing and, believing he was not free to decline the deputy's request, submitted" to the pat down,[120] but "did not give Defendant Thomas verbal or implied consent to search his person."[121] Defendants nevertheless argue that

---

[118] R. Doc. No. 41, at 12.

[119] In their reply in support of their motion, defendants argue that plaintiffs are attempting to apply a subjective standard to Thomas' reasonable cause determination. *Id.* at 11. While the Court agrees that "there is no legal requirement that an officer subjectively fear for his own safety before" undertaking a search, *United States v. Wallen*, 388 F.3d 161, 167 (5th Cir. 2004), the above-referenced case law pertains to the objective determination of whether the circumstances supported reasonable suspicion that Washington was armed and dangerous.

[120] R. Doc. No. 29, ¶ 70.

[121] *Id.* ¶ 71.

Washington consented to the search because he made a "gesture of submission" to Thomas.[122]

As discussed above, "consent is valid only if voluntary." *Id.* at 357. Viewed in the light most favorable to the plaintiffs, the fact that Washington's custodial status was not voluntary, and that he did not believe he was free to refuse the request,[123] support a finding that any consent given by Washington was not voluntary. *Hernandez*, 279 F.3d at 307. More importantly, the complaint states that he did not in fact consent.[124] Accordingly, the Court concludes that Washington has stated a claim for violation of his Fourth Amendment rights by way of an alleged unreasonable search by Thomas.

However, as Thomas has invoked qualified immunity, plaintiffs must point to law that clearly established, at the time of Thomas' conduct, that he was violating Washington's constitutional rights. Plaintiffs point to *Estep v. Dallas County, Texas*, 310 F.3d 353, 359 (5th Cir. 2002), as establishing that "alleged 'uncooperativeness' could not justify an additional seizure and search without additional particularized reasonable suspicion."[125] In that case, the court held that the defendant's "alleged uncooperativeness could not justify the vehicle search because, viewed in the light most favorable to" the plaintiff, the facts indicated that the defendant officer "was the individual being uncooperative in the situation." *Id.* Defendants argue that *Estep* is

---

[122] R. Doc. No. 33-1, at 22.
[123] R. Doc. No. 29, ¶ 70.
[124] *Id.* ¶ 71.
[125] R. Doc. No 38, at 28.

factually distinguishable because, there, the officers had arrested the plaintiff, placed him in the police car, and searched his vehicle.[126]

While it is true that the complaint does not allege that Washington was arrested or placed in a police car, nor that his car was searched, *Estep* had established at the time of defendants' conduct that mere "uncooperativeness" does not provide a basis for reasonable suspicion that an individual was armed and dangerous. 310 F.3d at 259. Moreover, as discussed above, reading the complaint in the light most favorable to the plaintiffs, it is not even clear that Washington was being uncooperative.

Plaintiffs also cite to *Arizona v. Johnson*, which had clearly established at the time of the alleged incident that an officer must reasonably believe that a person is armed and dangerous in order to justify a frisk during a traffic stop. 555 U.S. at 326–27. Disregarding defendants' argument regarding uncooperativeness, which is not sufficiently supported by the complaint, the only circumstances that defendants have raised supporting reasonable suspicion that Washington was armed and dangerous are that it was evening and that there was an apparently open traffic-related warrant against him. Under the clearly established law discussed above and pointed to by plaintiffs, a reasonable officer would have known that these circumstances did not give rise to reasonable suspicion that Washington was armed and dangerous. Moreover, defendants' argument that Washington consented to the frisk is inappropriate for resolution at the motion-to-dismiss stage, as the complaint states

---

[126] *Id.* at 14.

that he did not consent. Accordingly, defendants' motion for judgment on the pleadings will be denied with regard to Washington's claim for unlawful search.

### f. *Monell* Liability (Washington and Lane Against Smith)

Plaintiffs allege that Smith, in his official capacity as St. Tammany Parish Sheriff, "has developed and maintained policies, practices and customs exhibiting deliberate indifference to the constitutional rights in St. Tammany Parish" and that these policies "caused the [alleged] violation of" Washington's and Lane's constitutional rights.[127] Specifically, plaintiffs allege that Smith "failed to supervise Individual Defendants Thomas, Wood, and Bridel" with regard to the traffic stop and attendant constitutional concerns,[128] and that Smith "overtly and tacitly encourages and/or sanctions" a policy of not responding to or investigating citizens' complaints against police,[129] as allegedly demonstrated by Washington's and Lane's efforts with respect to filing a complaint with the STPSO.

Claims against a sheriff in his official capacity "are actually claims against the local government entity he serves." *Pudas v. St. Tammany Par., La.*, 18-10052, 2019 WL 2410939, at *3 (E.D. La. June 7, 2019) (Barbier, J.). Such claims must therefore comply with the requirements for § 1983 claims against municipalities. *Id.*

Municipal entities are not subject to § 1983 liability via a theory of *respondeat superior. Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). However, a municipality may be subject to liability pursuant to § 1983 when the municipality

---

[127] R. Doc. No. 29, ¶ 231.

[128] *Id.* ¶ 234

[129] *Id.* ¶ 246

maintains an unconstitutional policy or custom. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 691). These claims are sometimes referred to as "*Monell* claims," in reference to the Supreme Court case by that name. 436 U.S. 658. In order to state a claim against a municipal defendant for an alleged unconstitutional policy or practice, the plaintiff must allege that (1) an official policy (2) promulgated by a policymaker (3) was the moving force behind the violation of a constitutional right. *Hicks–Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017) (citations omitted).

An "official policy or custom" giving rise to liability pursuant to *Monell* may be "a persistent, widespread practice which, although not officially promulgated, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Esteves v. Brock*, 106 F.3d 674, 677 (5th Cir. 1997) (quotation omitted). However, "[a] plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity." *Pudas*, 2019 WL 2410939, at *3 (alteration in original) (quoting *Colle v. Brazos Cnty., Tex.*, 981 F.2d 237, 245 (5th Cir. 1993)). To plausibly plead "a practice 'so persistent and widespread as to practically have the force of law,' . . . a plaintiff must do more than describe the incident that gave rise to his injury." *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018).

A *Monell* claim may be based on a municipality's alleged failure to train, supervise, or discipline employees. *See id.* at 623. To state a claim that a municipality is liable for failing to train, supervise, or discipline an employee, the plaintiff must allege "(1) that the municipality's training, supervisory, or disciplinary polices or

practices were inadequate, (2) that the municipality was deliberately indifferent in adopting this deficient policy, and (3) that the inadequate training, supervisory, or disciplinary policy directly caused the violations in question." *Hankins v. Wheeler*, 21-1129, 2022 WL 2208848, at *7 (E.D. La. June 21, 2022) (Fallon, J.) (citing *Ratliff v. Aransas Cnty., Tex.*, 948 F.3d 281, 285 (5th Cir. 2020)).

"Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference." *Livezey v. City of Malakoff*, 657 F. App'x 274, 278 (5th Cir. 2016) (quotation and citation omitted). In the absence of a pattern of similar violations, a plaintiff may sometimes "establish deliberate indifference through the single-incident exception." *Hutcheson v. Dallas Cnty., Tex.*, 994 F.3d 477, 482 (5th Cir. 2021). To fit within this "extremely narrow" exception, the plaintiff must show "that the highly predictable consequence of a failure to train would result in the specific injury suffered." *Valle*, 613 F.3d at 549. "An injury is 'highly predictable' where the municipality 'fail[s] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face.'" *Hankins*, 2022 WL 2208848, at *7 (quoting *Hutcheson*, 994 F.3d at 482−83). "The single-incident exception 'is generally reserved for those cases in which the government actor was provided no training whatsoever.'" *Hutcheson*, 994 F.3d at 483 (quoting *Peña*, 879 F.3d at 624). Similarly, in order to establish liability for a failure to supervise, "it must have been obvious that the highly predictable consequence of not supervising [the employees] was that they would"

commit the specific constitutional violation alleged. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009).

At the motion to dismiss stage, "only minimal factual allegations" are required to state a claim for policy or practice liability. *Donahue v. Strain*, No. 15-6036, 2017 WL 3311241, at *18 (E.D. La. Aug. 3, 2017) (Morgan, J.). "This is so because, at the pleading stage, plaintiffs usually will not have access to or personal knowledge of the specific details of a municipality's internal training or supervisory policies and procedures." *Hankins*, 2022 WL 2208848, at *7. Even so, the plaintiffs must do more than simply recite the legal elements of their claim. *Id.* (citing *Iqbal*, 556 U.S. at 678).

As plaintiffs have premised their *Monell* claims on both the officers' conduct during the traffic stop and the Doe employees' conduct during the complaint process, the Court addresses each separately.

     *i.*    *Allegations Related to Conduct of Wood, Thomas, and Bridel*

Plaintiffs have alleged that Smith "should have provided adequate oversight over STPSO deputies conduct with respect to a procedure as routine and frequent as a traffic stop" and that he nevertheless "took no action" to do so.[130] Plaintiffs argue that these allegations are sufficient to support a failure to train or supervise, pointing to the fact, as alleged in the complaint, that the STPSO Budget Book for 2021 stated that 30 complaints against STPSO were investigated in 2019, and it was projected there would be 20 complaints in 2020 and 35 complaints in 2021.[131] Plaintiffs argue

---

[130] R. Doc. No. 29, ¶¶ 232, 234.
[131] *Id.* ¶ 251.

that this information put STPSO on "constructive notice that their officers needed additional supervision and training" and that defendants' alleged constitutional violations during their interaction with plaintiffs "evidences a lack of proper training for STPSO deputies."[132]

As stated above, in order to state a claim for *Monell* liability for failure to train or supervise, plaintiffs must allege that (1) the municipality's training or supervisory policies or practices were inadequate, (2) the municipality was deliberately indifferent in adopting those polices or practices, and (3) the policies or practices caused plaintiffs' constitutional injuries.

Regarding the first element, the complaint is not specific as to how STPSO's training or supervisory policies under Smith were inadequate. "In order for 'liability to attach based on an "inadequate training" claim, a plaintiff must allege with specificity how a particular training program is defective.'" *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010) (quoting *Roberts*, 397 F.3d at 293). Plaintiffs have not alleged, for example, that STPSO failed to implement a proposal for additional training on Fourth Amendment traffic stop standards, or that STPSO was aware of a history of constitutional violations by the individual officers and nevertheless failed to act. *See Valle*, 613 F.3d 536 (determining that plaintiffs "presented sufficient summary judgment evidence to raise a jury question" as to whether the city's training policies were inadequate when it refused to implement a proposal for additional crisis intervention training for officers); *Bennett v. Serpas*, No.

---

[132] R. Doc. No. 38, at 10.

15-3087, 2017 WL 2778109, at *3 (E.D. La. June 26, 2017) (Zainey, J.) (determining that plaintiffs sufficiently alleged inadequate training when a report issued pursuant to a consent decree identified department-wide failures of police training and recruitment, and where the defendant was aware of a similar pattern of constitutional violations by the individual defendants).

Even assuming that the first element was satisfied, although it was not, plaintiffs have failed to adequately allege deliberate indifference, the second element. Plaintiffs have based their failure to supervise allegation on the single incident of plaintiffs' traffic stop. Accordingly, in order to establish deliberate indifference, their claim must fall within the "extremely narrow" single-incident exception, typically reserved for incidents in which the government actor was provided no training at all. *Valle*, 613 F.3d at 549; *Hutcheson*, 994 F.3d at 483. Plaintiffs have not alleged, and the complaint does not allow the Court to infer, that the officers were provided no training at all on the Fourth Amendment standards for traffic stops; indeed, the complaint states that "STPSO has formal policies that should have but did not deter" the individual defendants' conduct.[133] *Hutcheson*, 994 F.3d at 483 ([P]laintiffs cannot avail themselves of [the single-incident] exception because they do not allege that there was 'no training whatsoever.'").

Moreover, though plaintiffs have argued that the Budget Book's complaint data supports their claim of deliberate indifference, they have not alleged that those

---

[133] R. Doc. No. 29, ¶ 248. Additionally, plaintiffs' opposition states that the received and projected complaints put STPSO "on constructive notice that their officers needed *additional* supervision and training." R. Doc. No. 38, at 11 (emphasis added).

complaints were made against the individual defendants in this case, nor that those complaints were specifically related to Fourth Amendment violations during traffic stops. *See Bennet,* 2017 WL 2778109, at *3 (determining that plaintiff had adequately alleged deliberate indifference when the complaint alleged that a consent decree report had alerted the department to widespread use of excessive force, the individual defendants had a history of excessive force complaints against them, and plaintiff alleged that he had been subjected to excessive force).

Finally, plaintiffs also argue that they have stated a claim for failure-to-discipline liability, because they alleged that "STPSO has not decertified a single officer in 15 years" and "[d]efendants are silent as to whether there was any investigation into any of [Washington's and Lane's] alleged constitutional violations" allegedly perpetrated by Bridel, Thomas, and Wood.[134] A *Monell* claim for failure to discipline requires a showing that "a pattern of similar [constitutional violations] went ignored." *Hegeman v. Harrison*, No. 18-613, 2019 WL 1277523, at *12 (E.D. La. Mar. 20, 2019) (Feldman, J.). Plaintiffs' allegations regarding the lack of investigation or discipline into the single traffic stop that occurred on March 13, 2021, do not allow the Court to infer that STPSO's *policies* were inadequate or deliberately indifferent to citizens' constitutional rights. *See Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001) (noting that "it is nearly impossible to impute lax disciplinary policy to the City without showing a pattern of abuses that transcends the error made in a single case," and that alleged failure to investigate or discipline two police officers

---

[134] R. Doc. No. 38, at 11–12.

involved in a single allegedly unconstitutional incident did not on its own establish that the municipality was liable for failure to discipline); *accord Fraire v. City of Arlington*, 957 F.2d 1268, 1278–79 (5th Cir. 1992) ("[A] city's custom or policy authorizing or encouraging police misconduct cannot be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality." (quotation and citation omitted)).

Finally, the fact, as alleged in the complaint, that STPSO has allegedly not decertified an officer during the last 15 years does not suffice to allege a pattern nor deliberate indifference because plaintiffs have not alleged that STPSO has failed to discipline officers whose conduct resembled that of the individual defendants in this case. Without such allegations, the Court cannot infer that STPSO has engaged in a pattern of conduct of failing to discipline officers for similar constitutional violations. *See Hegeman*, 2019 WL 1277523, at *12 (finding that plaintiff adequately alleged failure to discipline where the complaint stated that the city "repeatedly failed to discipline [an individual officer] and others for their use of force," that "over 200" complaints received by the city within the prior four year "concerned the use of unauthorized force," and plaintiff alleged that she had been subjected to unauthorized use of force).

In sum, plaintiffs do no more than "describe the incident that gave rise to" their injuries and ask the Court to infer from those allegations that Smith is potentially liable. *Peña*, 879 F.3d at 622. Though courts have required "only minimal factual allegations" in order to state a claim for policy and practice liability, here the

41

plaintiffs have done no more than simply recite the elements of their claim and advance conclusory and speculative factual assertions. *Hankins*, 2022 WL 2208848, at *7. The Court concludes that plaintiffs have failed to state a claim for inadequate training, supervision, and discipline arising from the traffic stop.

> ii.     *Allegations Related to Conduct of the Doe Defendants*

Plaintiffs also premise their *Monell* claim on the acts allegedly undertaken by the Doe defendants during plaintiffs' attempt to file a complaint regarding the traffic stop.[135] Plaintiffs allege that multiple employees at multiple offices violated their First Amendment rights by impeding the filing of a complaint, and that "[i]t is unlikely that [plantiffs] are the only victims of this practice" because there were only six complaints lodged against STPSO in March 2021 and only one was sustained on review.[136]

Though the complaint appears to allege that STPSO, under Smith, maintains an unconstitutional policy of ignoring and impeding citizen complaints,[137] plaintiffs primarily defend their claims as alleging insufficient training, supervision, and

---

[135] The underlying constitutional claim against the Doe defendants is not discussed in this opinion, as those defendants have not been identified or served. The Court notes that the First Amendment guarantees citizens the right to petition the government, including utilizing a police department's citizen complaint process. *Gates v. City of Dallas*, 729 F.2d 343, 345 (5th Cir. 1984).

[136] R. Doc. No. 29, ¶ 245.

[137] *Id.* ¶ 242 (stating that plaintiffs' experiences "indicate a pattern and practice of ignoring and obfuscating complaints, and fostering a culture of impunity for officers who commit constitutional violations").

discipline.[138] Either way, the Court concludes that plaintiffs have failed to adequately allege these claims.

First, to the extent plaintiffs allege that STPSO maintains an unconstitutional policy of obfuscating complaints, plaintiffs have failed to allege that this practice is "so persistent and widespread as to practically have the force of law," as they base their complaint on only their experience attempting to report a single traffic stop. *Peña,* 879 F.3d at 622. While plaintiffs have alleged that "it is unlikely that [they] are the only victims of this practice,"[139] this conclusory and speculative allegation does not allow the Court to infer that STPSO, under Smith, has maintained a practice rising to the level justifying municipal liability. *See id.* (rejecting plaintiff's claim of policy and practice liability where "the only specific fact in the complaint" related to the alleged policy was "the single incident in which [plaintiff] was involved").

The fact, as alleged in the complaint, that STPSO investigated only 10 complaints in 2021 does not change this conclusion. Courts have rejected arguments that statistics regarding citizen complaints, without more, are sufficient to state a claim for policy and practice liability. *E.g.*, *Webb v. City of Waterloo*, No. 17-2001, 2019 WL 6736219, at *22 (N.D. Ia. Dec. 11, 2019) (holding that "plaintiff's statistics [regarding the percentage of citizen complaints that were sustained against police officers], without further context, are not probative as to the City's *Monell* liability"); *Groark v. Timek*, 989 F. Supp. 2d 378, 387 (D.N.J. 2013) (noting, in the context of a

---

[138] *See* R. Doc. No. 38, at 7−12.
[139] R. Doc. No. 29, ¶ 245.

*Monell* claim, that "[i]f a plaintiff relies mainly on statistics showing the frequency of excessive force complaints and how frequently they are sustained, the plaintiff must show why the prior incidents were wrongly decided and how the misconduct in the case is similar to that involved in the present action.").

Next, to the extent that plaintiffs allege that the Doe defendants' conduct indicates a failure to train, supervise, or discipline, plaintiffs' allegations are insufficient for largely the same reasons that the *Monell* allegations based on the officers' conduct are insufficient. Again, to state a claim for failure to train, supervise, or discipline, plaintiffs must allege that (1) the municipality's training, supervisory, or disciplinary policies or practices were inadequate, (2) the municipality was deliberately indifferent in adopting those polices or practices, and (3) the policies or practices caused plaintiffs' constitutional injuries. *Hankins*, 2022 WL 2208848, at *7.

Plaintiffs have not alleged how the training, supervision, or discipline of Doe defendants was inadequate. *See Zarnow*, 614 F.3d at 170. Instead, they make conclusory statements that Smith "overtly and tacitly encourages and/or sanctions" the policy of failing to respond to complaints, but do not specify how he does so.[140]

Additionally, they have not sufficiently alleged facts showing deliberate indifference. First, though plaintiffs argue that the alleged interactions with the Doe defendants indicate "a consistent pattern of behavior" because they took place at "multiple STPSO offices,"[141] the Court concludes that these allegations do not rise to

---

[140] *Id.* ¶ 246.
[141] R. Doc. No. 38, at 11.

a level justifying imposition of municipal liability for failure to train, supervise, or investigate. Though plaintiffs allegedly visited two offices and interacted with multiple employees, their claims are premised solely on their own experience attempting to lodge a complaint about a single traffic stop. They have not alleged that other citizens have experienced similar treatment when attempting to file a complaint, nor that the STPSO employees involved had previously committed similar violations. In contrast, courts have held that plaintiffs' claims of deliberate indifference with regard to a municipality's failure to train, supervise, or discipline were factually supported where, for example, a single employee had committed a pattern of similar violations. *Hegeman*, 2019 WL 1277523, at *12 (eleven use-of-force complaints against the same officer over eight years). Moreover, "a single prior instance [of misconduct does] not establish a pattern." *Livezey*, 657 F. App'x at 278.

Plaintiffs themselves acknowledge that STPSO has policies in place that, under STPSO policy, plaintiffs' complaints should have been recorded.[142] Therefore, plaintiffs have not alleged that the Doe defendants were not trained at all—instead, they appear to allege that they were trained, but did not follow procedure, which is inadequate to support deliberate indifference. *See Hutcheson*, 994 F.3d at 483 (plaintiffs failed to allege deliberate indifference where complaint stated that the defendant sheriff's office provided some training). Allegations that Smith "[was] aware, or should have been aware" of Washington's and Smith's efforts to lodge a complaint, moreover, do not allow the Court to infer that Smith actually was aware

---

[142] R. Doc. No. 29, ¶ 240.

and nevertheless acted with deliberate indifference to an "obvious" risk that STPSO employees would perpetrate constitutional violations. *Peterson*, 588 F.3d at 850.

Accordingly, plaintiffs' *Monell* claim against Smith will be dismissed.

### c.  Title VI Claim (Washington and Lane Against Smith)

Title VI of the Civil Rights Act of 1964 provides in relevant part that "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Private individuals may bring suit to enforce this provision. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015). However, "because Title VI 'prohibits only intentional discrimination,' . . . a Title VI plaintiff must prove discriminatory intent" in order to prevail. *Billiot v. Terrebonne Par. Sch. Bd.*, No. 21-1144, 2021 WL 5083710, at *3 (E.D. La. Nov. 2, 2021) (Barbier, J.) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)).

In order to state a claim pursuant to § 2000(d), a plaintiff must allege that (1) "the defendant engaged in *intentional* discrimination based on race, color, or national origin; and (2) that the defendant received federal financial assistance." *Pathria v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 531 F. App'x 454, 455 (5th Cir. 2013) (emphasis in original). Where a plaintiff does not allege the existence of a discriminatory policy, he "must show that (1) [an] appropriate person with authority, (2) had actual knowledge of discrimination, and (3) that person responded with deliberate indifference." *Doan v. Bd. of Supervisors of La. State Univ.*, No. 17-3471,

2017 WL 4960266, at *2 (E.D. La. Nov. 1, 2017) (Zainey, J.); *accord Bhombal v. Irving*

*Indep. Sch. Dist.*, 809 F. App'x 233, 237 (5th Cir. 2020) ("Because the Bhombals do

not allege a discriminatory policy by IISD, they must plausibly allege that an

'appropriate person' in the district—i.e., someone who could take corrective

measures—had 'actual knowledge' of intentional discrimination yet responded with

'deliberate indifference.'").

In support of their Title VI claim, plaintiffs reference statistical disparities

between the arrest and incarceration rates of African American and white individuals

in Louisiana,[143] a 2010 statement by former St. Tammany Sheriff Rodney Strain,[144]

a 2014 incident in which racist and offensive emails between STPSO detectives were

revealed to the public,[145] and a complaint against an STPSO officer for using a racial

slur lodged approximately two weeks before plaintiffs' traffic stop.[146]

Defendants argue that these allegations are irrelevant to plaintiffs' Title VI

claim, as the majority of the incidents alleged occurred prior to the beginning of

Smith's tenure as sheriff, which began on July 1, 2016.[147] In response, plaintiffs argue

that their "claims are against the office for its policies and procedures, and the proper

party for an official capacity claim is the current occupant of the office."[148] In support

---

[143] *Id.* ¶¶ 261–263.

[144] *Id.* ¶¶ 265–266.

[145] *Id.* ¶¶ 267−268.

[146] *Id.* ¶ 269.

[147] R. Doc. No. 33-1, at 8.

[148] R. Doc. No. 38, at 20. In their opposition, plaintiffs also argue that "at least two STPSO [employees] at the time . . . had actual knowledge of the discrimination against Plaintiffs and responded with deliberate indifference." *Id.* (referencing allegations that Emile Lubrano was made aware of plaintiffs' attempts to file a

of this argument, plaintiffs cite Federal Rule of Civil Procedure 25(d), which provides that, "when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending," the officer's successor is substituted as a party. Plaintiffs also cite *American Civil Liberties Union of Mississippi, Inc. v. Finch*, in which the Fifth Circuit stated that, where a plaintiff files a civil rights lawsuit against a public official, and the official then leaves office, "courts should freely imply" that the successor "will continue the challenged practice" so long as "plaintiffs have supplied factual allegations from which the continuation of the dispute is a reasonable inference." 638 F.2d 1336, 1346 (5th Cir. 1981).

Rule 25 and *Finch* have little application here. Both Rule 25 and *Finch* contemplate a scenario in which a plaintiff sues a government official, and, while that lawsuit is pending, a successor succeeds the original defendant's office. Here, in contrast, plaintiffs attempt to bring a Title VI claim against Smith on the basis of incidents that occurred during his predecessor's tenure.

Moreover, in *Finch*, the Fifth Circuit declined to "constru[e] the complaint to allege by implication that the challenged activities were a matter of state policies," where "the only specific incidents mentioned in the complaint involved members of the outgoing administration." *Finch*, 638 F.2d at 1346. Only a single incident alleged in the complaint in support of plaintiffs' Title VI claim took place during Smith's

---

complaint but did not contact them, R. Doc. No. 29 ¶¶ 117–119, and allegations that a Doe defendant told Washington that he would not write up any deputies, *id.* ¶ 237. However, plaintiffs have alleged no facts to support an inference that Smith knew about Lubrano's or Doe's conduct. Additionally, the complaint does not support an inference that these interactions amounted to intentional racial discrimination.

tenure: the complaint against an STPSO captain for using a racial slur.[149] Plaintiffs themselves acknowledge that that captain no longer works for STPSO.[150]

Even setting aside these issues, the Court concludes that plaintiffs have failed to state a Title VI claim, as they have not adequately alleged that Smith knew about the incidents referenced in the complaint. *Doan*, 2017 WL 4960266, at *2; *Bhombal*, 809 F. App'x at 237.  The only portion of the complaint that attempts to connect Smith to the incidents supporting the Title VI claim states that "[u]pon information and belief, employees of the STPSO have been made aware that STPSO deputies are engaging in racial profiling but have refused to take corrective action."[151] Even viewing the complaint in the light most favorable to the plaintiffs, this conclusory allegation cannot support an inference that Smith knew about intentional racial discrimination, but nevertheless chose not to act. Accordingly, the Court concludes that plaintiffs have failed to state a claim for relief pursuant to Title VI.

### g.  Attorney's Fees Pursuant to 42 U.S.C. 1988

42 U.S.C. § 1988 provides that a court may award attorney's fees to a prevailing party in a civil rights case. 42 U.S.C. § 1988(d). In their motion, defendants request that the Court award them attorney's fees pursuant to § 1988.[152]

While § 1988 "creates a presumption that that attorney's fees will be granted to a prevailing civil rights plaintiff," an award of attorney's fees to a prevailing

---

[149] *Id.* ¶ 269.

[150] *Id.*

[151] *Id.* ¶ 270.

[152] R. Doc. No. 33-1, at 27.

defendant is "presumptively unavailable, . . . and is proper only upon a finding that the plaintiff's suit is frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly becomes so, regardless of whether the suit was brought in good faith." *Doe v. Silsbee Indep. Sch. Dist.*, 440 F. App'x 421, 424–425 (5th Cir. 2011) (internal citation and quotations omitted). "In determining whether a suit is frivolous, 'a district court should look to factors such as whether the plaintiff established a prima facie case, whether the defendant offered to settle, and whether the court held a full trial.'" *Lewis v. Smith*, No. 18-4776, 2019 WL 4521422, at *2 (E.D. La. Sept. 19, 2019) (Ashe, J.) (quoting *Myers v. City of W. Monroe*, 211 F.3d 289, 292 (5th Cir. 2000)).

Defendants do not argue, and the Court does not find, that plaintiffs' claims were frivolous, unreasonable, or groundless. Though the Court has concluded that plaintiffs failed to allege some causes of action and failed to overcome qualified immunity on others, the fact that a defendant prevails on a motion to dismiss does not establish that the plaintiff's claims were frivolous. *Lewis*, 2019 WL 4521422, at *3. Accordingly, the Court concludes that defendants are not entitled to attorney's fees.

Accordingly,

**IT IS ORDERED** that defendants' motion for judgment on the pleadings is **GRANTED IN PART.** The following claims are **DISMISSED WITH PREJUDICE**: Washington and Lane's claim for unlawful extension of the traffic stop,[153] Lane's

---

[153] R. Doc. No. 29, ¶¶ 142–153.

claim for unlawful seizure,[154] Washington and Lane's claim for First Amendment retaliation,[155] Washington and Lane's § 1983 claim against Smith,[156] and Washington and Lane's Title VI claim against Smith.[157]

**IT IS FURTHER ORDERED** that defendants' motion for judgment on the pleadings is **DENIED** with regard to Washington's claim for unlawful search.[158]

New Orleans, Louisiana, November 8, 2022.

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[154] *Id.* ¶¶ 154–181.
[155] *Id.* ¶¶ 182–200.
[156] *Id.* ¶¶ 229–257.
[157] *Id.* ¶¶ 258–281.
[158] *Id.* ¶¶ 201–209.