**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| BRUCE WASHINGTON, Individually and | * | CIVIL ACTION NO. 2:22-cv-632 |
| GREGORY LANE, Individually | * | |
| Plaintiffs, | * | |
| | * | |
| VERSUS | * | JUDGE LANCE M. AFRICK |
| | * | |
| RANDY SMITH, in his official capacity as | * | |
| SHERIFF OF ST. TAMMANY PARISH, | * | |
| LOUISIANA; JACKSON BRIDEL in his | * | MAG. JUDGE |
| Individual capacity; ALEXANDER THOMAS | * | MICHAEL NORTH |
| in his individual capacity; SHAUN WOOD in | * | |
| his individual capacity; and JOHN DOE | * | |
| EMPLOYEES OF THE ST. TAMMANY | * | |
| PARISH SHERIFF'S OFFICE in their | * | JURY DEMAND |
| Individual capacities, | * | |
| Defendants, | * | |

*********************************************************************************

---

**SUR-REPLY IN FURTHER OPPOSITION TO PLAINTIFFS'**
**MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

---

**MAY IT PLEASE THE COURT:**

    **NOW COME** Defendants, Jackson Bridel, Alexander Thomas, Shaun Wood, and Randy Smith, in his official capacity as Sheriff of St. Tammany Parish, Louisiana, through undersigned counsel, who respectfully submit the following Sur-Reply in further opposition to Plaintiffs' Motion for Leave to File Third Amended Complaint.

    **1.  Plaintiffs' Attacks Against Counsel for Defendants**

    Benjamin Franklin is noted to have said "Half the truth is often a great lie."[1]  Such a remark cannot help but come to mind when analyzing Plaintiffs' Reply Memorandum in Support of their Motion for Leave to File Third Amended Complaint.  Upon review, it is clear that as the Plaintiffs'

---

[1] Evans, B. (1978). Dictionary of Quotations (p. 387). Delacorte Press, New York. (Citing Benjamin Franklin: *Poor Richard's Almanack*.)

Page **1** of 23

meritless and frivolous lawsuit hangs by a thread, the litigation tactic now employed by Plaintiffs' counsel is a desperate move to personalize the lawsuit between the lawyers by maligning the Defendants and their counsel.  It is undersigned counsel's experience that whenever attorneys resort to attacking the attorneys on the other side, that generally their case is already lost. Defendants respectfully suggest that is in fact what is going on here.  Following this pattern, Plaintiffs' counsel has now decided to **knowingly and falsely slander** undersigned counsel before this Honorable Court, leveling a myriad of **false accusations** against undersigned counsel, many of which are demonstrably false as shown herein, and some of which can be found within the letter submitted by Plaintiffs' counsel to Judge Michael North on December 6, 20222,[2] which prompted undersigned counsel to submit a letter in response to Plaintiffs' slanderous and defamatory allegations.[3]

Counsel for Plaintiffs has **falsely claimed** that (1) Defendants have intentionally obstructed the identification of the "Doe" Defendants throughout discovery and that (2) Defendants have continued to obstruct discovery through abusive and impermissible deposition practices.  Plaintiffs have resorted to making these **knowingly false and slanderous accusations** of bad faith against undersigned counsel in an apparent last-ditch effort to convince this Honorable Court to grant Plaintiffs' Motion for Leave to File their TAC under the doctrines of equitable tolling and/or *contra non valentem*.[4]

One such tactic which Plaintiffs' counsel has chosen to implement in falsely accusing and slandering undersigned counsel is to deceptively attach to their Reply Memorandum a small, selectively chosen number of pages from various depositions, each taking place over the course of

[2] *See* R. Doc. 101.
[3] *See* R. Doc. 103.
[4] *See* R. Doc. 97, pgs. 13-15.

**several hours**.  Plaintiffs' counsel has gone as far as producing single pages of these depositions as exhibits to their Reply Memorandum solely for the purpose of concealing the entire context of these conversations between counsel as well as what led to them from this Honorable Court.  It is no mistake to believe that Plaintiffs' counsel has purposefully engaged in this practice in the hopes of providing a false representation of the facts and circumstances to this Honorable Court.  Defendants, in the interests of transparency, attach hereto **full and complete** copies of every deposition taken in this matter, in order to provide this Honorable Court with the **full and complete** context, instead of the single page(s) provided by Plaintiffs' counsel in the hopes of obfuscating the same.[5]

> **i.**   **Plaintiffs' False Claims that Defendants have intentionally obstructed identification of Doe Defendants throughout discovery**
>
> **a.**   **Counsel for Plaintiffs' False Accusation that Defendants are currently withholding STPSO Employee "Desk Logs"**

Plaintiffs have **knowingly and falsely accused** Defendants of failing to produce documentation during the discovery process, claiming that "To this day, Defendants still have not produced the desk logs for March 15, 2021…"[6]  This is a clear misrepresentation to the Court. On November 7, 2022, in response to Plaintiffs' discovery request, Defendants mailed Supplemental Responses to Plaintiff's First Set of Interrogatories and Requests for Production, wherein the STPSO Employee Roster for March 14, 2021 through March 20, 2022, containing approximately 2,821 rows of information, was produced.[7]  A courtesy copy of this information was also emailed

---

[5] *See* deposition testimony of Alexander Thomas, attached herein as Exhibit "1"; *See also* R. Doc. 84-4 for Exhibit 9 to deposition testimony of Alexander Thomas; *See* deposition testimony of Jackson Bridel, attached herein as Exhibit "2"; *See also* R. Doc. 84-8 for Exhibit 3 to deposition testimony of Jackson Bridel; *See* deposition testimony of Emile Lubrano, attached herein as Exhibit "3"; *See* deposition testimony of Shaun Wood, attached herein as Exhibit "4"; *See* deposition testimony of Dale Galloway, attached herein as Exhibit "5"; *See* deposition testimony of Jeremy Travis, attached herein as Exhibit "6"; *See* deposition testimony of Christopher Graham, attached herein as Exhibit "7"; *See* deposition testimony of Bruce Washington, attached herein as Exhibit "8"; *See* deposition testimony of Gregory Lane, attached herein as Exhibit "9"; *See* deposition testimony of John Ryan, attached herein as Exhibit "10."

[6] *See* R. Doc. 97, pg. 5.

[7] *See* Correspondence to Plaintiffs' Counsel dated November 7, 2022, attached herein as Exhibit "11"; *See also* STPSO Employee Roster for March 14, 2021, through March 20, 2022, attached herein as Exhibit "12"; *See also*

to Plaintiffs' counsel that same day.[8]   This production by Defendants gave the Plaintiffs a total

listing of all employees who were working during the period in question.[9]   As detailed in the

attached correspondence, this information has been in Plaintiffs' custody since November 7,

2022,[10] over **twenty-two (22) days** prior to the filing of Plaintiffs' Reply Memorandum in Support

of Plaintiffs' Motion for Leave to File Third Amended Complaint, wherein Plaintiffs falsely accuse

Defendants of failing to produce this information.   **Defendants would further note that the**

**Plaintiffs' first and only suggestion that this supplemental production of November 7, 2022,**

**was in any way deficient was in their Reply Memorandum.**

      **b.   Counsel for Plaintiffs' False Accusation of Defendants attempts to Intentionally Mislead Plaintiffs' Counsel**

Counsel for Plaintiffs have further accused undersigned counsel of either intentionally or

negligently misleading Plaintiffs to believe that Deputies Lubrano and Travis had spoken to Plaintiffs

and merely lacked a clear recollection of the conversation.[11]   Plaintiffs' counsel cites to an October

24, 2022, email, in which counsel for Defendants notified Plaintiffs' counsel as follows:

> "Also, I have spoken with STPSO employees, Jeremy Travis and Emile
> Lubrano, both of whom think they may have spoken with your client, but
> they do not have a very clear recollection of the conversation.

---

Correspondence STPSO Department Codes, attached herein as Exhibit "13".

[8] *See* Email Correspondence dated November 7, 2022, attached herein as Exhibit "14".

[9] Undersigned counsel is informed that the STPSO does not maintain records that would specifically identify all employees physically present and working at the Justice Center on 3/15/21, as plaintiffs have requested. The spreadsheet that was produced (exhibit 12), however, identifies all STPSO individuals employed by the agency between the time period requested by plaintiffs, i.e., 3/14/21 – 3/20/21. The spreadsheet also indicates employee number, employment status, the department assignment and the hours worked, if any, during the requested time frame of 3/14/21 – 3/20/21. The other document produced to the plaintiffs on November 7, 2022 (exhibit 13), is a copy of the STPSO Department Codes for each department within the agency. The departments located at the Justice Center include Administration (04), IS (07), Criminal Records (09), Property Tax (10), Court Security (12), Public Affairs (14), and Civil (15). Therefore, in order to ascertain who might have been present in the Justice Center during that time frame, it is necessary to cross reference the two documents. It should also be pointed out, however, that even if the spreadsheet indicates that an employee's primary assigned position reflects a department located in the Justice Center and that employee was working during the time frame specified, it does not mean he/she was necessarily physically present. As seen on the spreadsheet, there are some entries indicating "punch location is unverified" on the spreadsheet, which means that the employee did not punch in at the departmental time clock. They could have punched in from their desktop computer or at another department located at any STPSO location.

[10] *See* Exhibit 11.

[11] *See* R. Doc. 97, pg. 6.

Do you wish to depose them?

I have also checked with the STPSO Internal Affairs Division, and there is no record of anyone from IA speaking with your client."[12]

Counsel for Plaintiffs cite this email correspondence and an excerpt from the deposition testimony of Deputy Travis,[13] as "proof" that counsel for Defendants sought to intentionally obstruct the identification of Doe Defendants throughout discovery, and to further intentionally feign compliance with Defendants' discovery obligations.   A reading of the email, however, clearly provides that Deputies Travis and Lubrano were both unsure if they had spoken with Plaintiffs (hence the word "may," suggesting also that they may not have spoken to the plaintiffs) and that if they did, they do not have a clear recollection of the conversation.   Counsel for Plaintiffs has, instead, chosen to misconstrue this correspondence, and assert to this Honorable Court that it is somehow proof positive of counsel for Defendants engagement in some sort of nefarious behavior.   Such a far-reaching assertion by Plaintiffs borders on the absurd, especially when one considers the fact that this is the first time such a suggestion has been brought to the attention of undersigned counsel. Indeed, the entire point of undersigned counsel's email was to convey that these individuals did not possess relevant information so that Plaintiffs' counsel would not waste time deposing them.   If Plaintiffs' counsel wanted some clarification as to counsel's meaning or had any questions at all about this email, one would expect Plaintiffs' counsel to have simply replied to this email after it was sent asking for clarification.   It is telling, however, that there was no reply to this email from Plaintiffs' counsel with any questions.   Notwithstanding undersigned counsel's attempt to assist Plaintiffs' counsel by letting them know in advance that neither Jeremy Travis nor Emile Lubrano had any relevant information, so that they would not waste their time deposing these two individuals,

---

[12] *See* Exhibit Q to Plaintiffs' Reply Memorandum, R. Doc.97-17.
[13] *See* Exhibit S to Plaintiffs' Reply Memorandum, R. Doc. 97-19.

Plaintiffs' counsel nevertheless deposed both Jeremy Travis and Emile Lubrano for **6 hours and 54 minutes** combined, which then begs the question, how exactly were the Plaintiffs' prejudiced by this email?

> ii.   **Plaintiffs' False Claims of Obstruction through Abusive and Impermissible Deposition Practices**
>
> > a.   **Counsel for Plaintiffs' False Accusations of Withholding of Evidence that they know DOES NOT EXIST**

As previously noted, Plaintiffs' counsel has made a number of completely **false accusations** against undersigned counsel.  Another such example is provided in Plaintiffs' assertion that:

> "…the deposition of TAC Defendant Galloway revealed that the STPSO Internal Affairs department records phone calls from citizens seeking to file complaints. Despite the responsiveness of these recordings (which would likely include calls made by Plaintiffs), Plaintiffs' countless discovery and public records requests, and obvious relevance to the Plaintiffs' claims, Defense counsel never produced (let alone acknowledged the possible existence of) such recordings."[14]

Plaintiffs' assertion, however, is demonstrably **false**, and Plaintiffs' counsel fails to inform this Honorable Court of the following facts:

> 1)   On October 24, 2022, approximately six (6) weeks ago, undersigned counsel informed counsel for Plaintiffs that, "I have also checked with the STPSO Internal Affairs Division, and there is no record of anyone from IA speaking with your client;"[15]
>
> 2)   On October 26, 2022, the depositions of Plaintiffs, Bruce Washington and Gregory Lane, were taken.   During these depositions, both Mr. Washington and Mr. Lane admitted that after the incident, neither one had ever attempted to contact the Internal Affairs Division of the STPSO.[16]  Mr. Washington further confirmed that he never tried to contact Dale Galloway, head of the Internal Affairs Division of the STPSO;[17]

---

[14] *See* R. Doc. 97, pg. 7.

[15] *See* Email Correspondence dated October 24, 2022, attached herein as Exhibit "15".

[16] *See* Exhibit 8, pgs. 86-87, 100; *See also* Exhibit 3 to the Deposition of Bruce Washington, attached herein as Exhibit "8-A"; *See also* Exhibit 9, pgs. 61-62; *See also* Exhibit 3 to the Deposition of Gregory Lane, attached herein as Exhibit "9-A".

[17] *See* Exhibit 8, pg. 87.

3)    On November 2, 2022, undersigned counsel further informed counsel for Plaintiffs that Captain Dale Galloway, head of the Internal Affairs Division of the STPSO, had no recollection of ever speaking with either Plaintiff;[18]

4)    On November 3, 2022, despite Defendants confirmation in October that Internal Affairs had no record of anyone speaking to Plaintiffs, and both Plaintiffs admitting that they never contacted Internal Affairs or Captain Galloway, and despite Defendants confirming that Captain Galloway, himself, had no recollection of ever speaking with Plaintiffs, Plaintiffs' counsel informed undersigned counsel that they would nevertheless move forward with scheduling the deposition of Captain Galloway;[19] and

5)    On November 16, 2022, Plaintiffs took the deposition of Captain Galloway.  During his deposition, Captain Galloway testified that to his knowledge he never spoke with either Bruce Washington or Gregory Lane.[20]  Captain Galloway further testified that to his knowledge no one in the internal affairs division has ever spoken to Bruce Washington or Gregory Lane and that internal affairs never conducted an investigation with regard to any complaints made by Bruce Washington or Gregory Lane.[21]

As detailed above, Plaintiffs' counsel made the conscious decision to move forward with the deposition of Captain Galloway, despite Plaintiffs' counsel having full knowledge that Captain Galloway had **no relevant information or knowledge** to offer.  Additionally, Defendants note that while Plaintiffs' counsel is correct in that, during his deposition, Captain Galloway testified that telephone calls to the Internal Affairs Divisions are recorded,[22] as documented above, however, Plaintiffs' counsel has known since October 24, 2022, and has been consistently reminded, as recently as November 16, 2022, that the Internal Affairs Division has no records of Plaintiffs ever contacting Internal Affairs.  Plaintiffs' counsel is also abundantly aware that their

---

[18] *See* Email Correspondence dated November 2, 2022, attached herein as Exhibit "16".
[19] *See* Email Correspondence dated November 3, 2022, attached herein as Exhibit "17".
[20] *See* Exhibit 5, pgs. 32, 131-132.
[21] *Id*. at pg. 132.
[22] *See* Exhibit 5, pgs. 24-32.

own clients have testified that they **never** contacted Internal Affairs.[23]  Accordingly, Plaintiff's

counsel has full knowledge that **no such record of any supposed recording exists**.  Counsel for

Plaintiffs' **complete and utter failure to disclose** any of the above information to this Honorable

Court, along with their knowledge of it, was not simply a mistake or misunderstanding, it is,

Defendants' respectfully aver, instead a **deliberate act intended to mislead** this Honorable Court.

Plaintiffs' **false and misleading** accusations throughout their Reply Memorandum make clear that

their intentions are to make it appear as though undersigned counsel has acted and engaged in bad

faith efforts throughout the entirety of the discovery process, ostensibly for the purposes of

convincing this Honorable Court to grant their Motion for Leave to File TAC.

### b. Counsel for Plaintiffs' Knowingly False Accusations of Witness Coaching

Plaintiffs' counsel has further **knowingly and falsely accused** undersigned counsel of

"coaching witnesses."[24]  One would think that in making such an accusation regarding such unethical

conduct on the part of opposing counsel, one would surely present strong and compelling evidence

as part of such an allegation.  Indeed, one would expect that Plaintiffs would present evidence

before this Honorable Court of witnesses testifying that they were coached by undersigned

counsel.  Undersigned counsel has now reviewed the deposition testimony of every defense

witness, comprising **1,281 pages of deposition testimony**, amounting to a total of **26 hours 44**

**minutes of questioning**,[25] and Defendants have yet to find a single witness who corroborates such

an accusation.  Defendants assert that perhaps Plaintiffs have misplaced or simply forgotten to

attach this vital piece of evidence, and Defendants look forward to seeing it, whether it be an

---

[23] *See* Exhibit 8, pgs. 86-87, 100; *See also* Exhibit 8-A; *See also* Exhibit 9, pgs. 61-62; *See also* Exhibit 9-A.
[24] *See* R. Doc. 97, pg. 7.
[25] Defendants are still awaiting the final copy of the deposition testimony of Defendants' expert, John Ryan. Accordingly, Defendants have not included the amount of time over which this deposition was taken in the total.

affidavit or other testimony, or an audio recording of undersigned counsel coaching witnesses which Plaintiffs' counsel no doubt has mistakenly failed to attach to their Reply Memorandum.

### c. Counsel for Plaintiffs' Knowingly False Accusations of Prohibiting Emile Lubrano from being adequately deposed

Counsel for Plaintiffs has further accused undersigned counsel of preventing Plaintiffs from being able to adequately depose Emile Lubrano.  Plaintiffs assert that:

> "Defense counsel instructed witnesses to not answer questions he deemed to be irrelevant, prohibiting Plaintiffs from ascertaining how confident witnesses were that they had not spoken with Plaintiffs. For example, despite Plaintiffs' right to inquire as to what Lubrano did or did not recall about speaking to Plaintiffs on March 15, 2021, and how confident he was regarding that recollection (especially in light of Defense counsel's misleading October 24 e-mail, see supra p. 5 above), such questioning was baselessly prohibited by Defense counsel."[26]

As is the case for all of Plaintiffs' **_slanderous claims_**, Plaintiffs have provided only a select few pages of Deputy Lubrano's deposition, in order to prevent this Honorable Court from having the entire context.  A review of Deputy Lubrano's complete deposition, which Defendants have attached,[27] provides that the entire line of questioning Plaintiffs reference involves a suggestion that counsel for Plaintiffs, himself, spoke with the Defendants contemporaneously with the event, which then raises the question of Plaintiffs' counsel also being a witness in this matter.[28]  Accordingly, counsel for Plaintiffs' entire line of questioning was entirely improper, as it would suggest that Plaintiffs' counsel is a witness in this case, which would thus result in counsel and his entire firm being disqualified from representing Plaintiffs in this matter.

Further, as can be seen from the transcript, the entire line of questioning was repetitive and clearly meant to harass the witness.  Specifically, a review of the record reveals that counsel for

---

[26] _See_ R. Doc. 97, pg. 8.
[27] _See_ Exhibit 3, pgs. 81-89.
[28] _See_ ABA Rules of Professional Conduct, Rule 3.7, Lawyer as a Witness.

Plaintiffs asked Deputy Lubrano whether or not he had spoken with either of the Plaintiffs in this matter no less than **five (5) times** throughout the course of the deposition, to which he continually provided that he could not recall.[29]  To make sure there was no misunderstanding on this point, undersigned counsel also asked Deputy Lubrano whether to his knowledge, he had ever spoken with Gregory Lane or Bruce Washington, to which Deputy Lubrano again provided "To my knowledge, no."[30]  Accordingly, counsel for Plaintiffs' claim that they were not able to properly depose Deputy Lubrano in order to attain such information is **demonstrably false**, as the record clearly shows that this information was provided on the record and under oath no less than **six time**s throughout the deposition.

### 2. Plaintiffs' Testimony Directly Contradicts their Claims of Racial Prejudice, Discrimination and Bias within their Complaint

Plaintiffs' Second Amended Complaint ("SAC") begins by asserting that Plaintiffs' suit arises out of the STPSO's pervasive culture of racism and prejudice against Black Americans.[31] Plaintiffs' SAC further provides a lengthy discussion, accompanied with accusations of alleged institutional practices of racial prejudice, discrimination and bias by the Defendants, as well as the STPSO as a whole, against Plaintiffs in this matter, even asserting a claim for violation of "42 U.S.C. §2000(d)—Title VI of the Civil Rights Act of 1964."[32]  When asked what evidence Plaintiffs have to support such claims of racial prejudice and bias against the Defendants, however, the Plaintiffs were unable to provide any.

For example, when asked if he believed the stop was initiated because of some racial bias against him, Mr. Washington provided that his evidence consisted solely on the fact that he and

---

[29] *See* Exhibit 3, pgs. 28-29, 48, 81-83.
[30] *Id* at pg. 96.
[31] *See* R. Doc. 29, ¶ 2.
[32] *See* R. Doc. 29; Defendants further note that Plaintiffs' claim for violation of 42 U.S.C. §2000(d)—Title VI of the Civil Rights Act of 1964 was dismissed with prejudice on November 8, 2022 (*See* R. Doc. 61).

Mr. Lane were "Two black men in a car riding by him, 7, 8 o'clock at night."[33]  When asked what evidence he had to support the allegation within his complaint that "Despite vowing to serve and protect all members of the St. Tammany community, STPSO's pervasive culture of racism and prejudice against black Americans is well-documented," Mr. Washington provided that the extent of his evidence was that "They stopped two black men. They saw other people riding with no taillights and all that. They saw us and pulled us over."[34]

Additionally, when asked what evidence he has of racism within the St. Tammany Parish Sheriff's Office in the year of 2021, Mr. Lane provided that "I don't have any evidence. How would I have evidence of that?"[35]  When asked what evidence he had to support the allegation within his complaint that "Despite vowing to serve and protect all members of the St. Tammany community, STPSO's pervasive culture of racism and prejudice against black Americans is well-documented," Mr. Lane provided "I can't speak for everybody. I can only speak for myself, what I been through with them. I'm a black male here in St. Tammany Parish. I always get stopped."[36]

As can be seen from the foregoing, the Plaintiffs' own testimony directly contradicts Plaintiffs' allegations of institutional practices of racial prejudice, discrimination and bias by the STPSO, as Plaintiffs, themselves, have provided that they have no evidence to support their claims. While this may seem odd, especially considering that Plaintiffs have specifically pled such in their Complaint, it actually makes complete sense, given that when each of the Plaintiffs were presented with a copy of their Complaint during each of their depositions, both Plaintiffs testified that they had never seen or reviewed the complaint, which was filed on their behalf.[37]

---

[33] *See* Exhibit 8, pg. 50.
[34] *See* Exhibit 8, pgs. 63-64.
[35] *See* Exhibit 9, pg. 49.
[36] *See* Exhibit 9, pgs. 50-51.
[37] *See* Exhibit 8, pgs. 61-62; *See also* Exhibit 9, pgs. 49-50.

3. **Plaintiffs' Purposeful Misstatements of Fact and Additional False Claims**

Plaintiffs' Reply Memorandum further contains many purposeful misstatements of fact, as well as additional false claims against Defendants, with which Plaintiffs obviously hope to use in order to shape this Honorable Court's view of this matter as a whole.

      i. **Plaintiffs' false claim that Defendants attempted to mislead this Honorable Court and Plaintiff's misleading claim that they have conducted discovery in this matter prior to August 2, 2022.**

First, Plaintiffs falsely assert that "Defendants misleadingly state that Plaintiffs 'failed to conduct any discovery whatsoever in this matter in order to ascertain the identity of [Doe Defendants] until Plaintiffs mailed their First Sets of Discovery to Defendants on August 2, 2022,' but Plaintiffs have been investigating this matter since as early as October 26, 2021 via a Public Records Request ("PRR") submitted to the STPSO pursuant to La. Stat. Ann. § 44:1 (2022)."[38] Defendants first note that Plaintiffs are well aware that the filing of public records requests, prior to the initiation of Plaintiffs' lawsuit, is completely unrelated to engaging in the formal discovery process.[39]

As the record clearly reflects, Plaintiffs failed to conduct any discovery whatsoever in this matter in order to ascertain the identity of any of the unnamed Doe defendants until Plaintiffs mailed their First Sets of Discovery to Defendants on August 2, 2022, **over five (5) months** after filing their original Complaint and just **six (6) days before the deadline to file amendments to pleadings**.[40] These facts alone render Plaintiffs' aforementioned claims that Defendants have intentionally obstructed and not engaged in any reasonable or meaningful inquiry **demonstrably false**.[41]

---

[38] *See* R. Doc. 97, pg. 1.
[39] Defendants further note that Plaintiffs have included as Exhibit E (R. Doc. 97-5) to their Reply Memorandum, public records requests to the St. Tammany Parish Government ("STPG"). Defendants note that the STPG is a completely separate entity from the STPSO.
[40] *See* R. Docs. 78-1, 78-2, 78-3 and 78-4. Plaintiffs' First Sets of Discovery were not received by the Defendants until August 8, 2022. (*See* R. Doc. 78-5).
[41] *See* R. Doc. 97, pg. 2.

Plaintiffs' conscious decision to wait **over five (5) months** before finally deciding to engage in any discovery in this matter was not the result of any action or inaction by the Defendants, and any attempts by Plaintiffs' counsel to shift the blame to Defendants for their own failure to timely pursue their clients' claims are again **demonstrably false**.

### ii.   Plaintiffs' misleading statement with regard to undersigned counsel's receipt of Plaintiffs' discovery requests

Plaintiffs further claim in a footnote, that "Despite Defendants' representation that they did not receive Plaintiffs' Interrogatory No. 14 until August 8, 2022, see R. Doc. 78 at 13, all interrogatories were electronically sent to Defense counsel on August 2, 2022."[42] Defendants would note that Plaintiffs' counsel must have forgotten that Defendants **never consented to e-service for discovery**. In fact, when counsel for Plaintiffs specifically asked whether or not counsel for Defendants would consent to e-service of all discovery correspondence, counsel for Defendants replied "I prefer to stick with traditional service for discovery, but I always will send a courtesy copy via email."[43]

### iii.   Plaintiffs' false and misleading conflation between official STPSO reports and training records

Plaintiffs make the false and misleading conflation that a Daily Observation Report constitutes an official STPSO incident report.[44] Plaintiffs have attached the Daily Observation Report of Deputy Shaun Wood to their Reply Memorandum,[45] asserting that it is an internal report of the incident at issue, which the STPSO failed to turn over **prior** to the filing of Plaintiffs' suit.[46]

---

[42] *See* R. Doc. 97, pg. 3, footnote 11.
[43] *See* email correspondence to Plaintiffs' counsel dated July 21, 2022, attached herein as Exhibit "18".
[44] *See* R. Doc. 97, pg. 2.
[45] *See* Exhibit C to Plaintiffs' Reply Memorandum, R. Doc. 97-3.
[46] Defendants would note, however, that even assuming the Daily Observation Report is an "incident report" (which it is not), and that it should have been provided to Plaintiffs in response to their pre-suit public records requests, the Plaintiffs fail to explain how this document would have assisted the Plaintiffs in their effort to identify the so-called "Doe" defendants. At most, this Daily Observation Report is nothing more than a summary of part of what is memorialized on the body-cam videos of the three Defendant deputies, and each of these videos were provided to the

Defendants first note that Plaintiffs **incorrectly** refer to this observation report as "Defendant Thomas's Daily Observation Report on the incident."[47]   A cursory review of the observation report, attached as Exhibit C to Plaintiffs' Reply Memorandum, provides that it is the observation report of Deputy Shaun Wood, **not** Deputy Alexander Thomas, as claimed by Plaintiffs.  Defendants further note that Daily Observation Reports **are not incident reports** and are **never** used as such.  These reports are simply **training records**, meant to show an employee's daily ability to progress as a Deputy.  This would explain not only why each report has a grade of 1-7 next to it, but further explains why the report consistently refers to Deputy Wood as a "recruit" and "Trainee," and why the report was produced in discovery as part of Deputy Wood's training records in August of this year.[48]

### 4. Counsel for Plaintiffs have continually engaged in abusive and inappropriate behavior throughout the discovery process

#### i.    Inordinate Number of Discovery Requests and Depositions

The entirety of this suit stems from Plaintiffs' interactions with three (3) STPSO deputies during a single, twenty (20) minute traffic stop, in which there was no use of force, and in which only one claim currently remains, Plaintiff Washington's claim for an alleged unlawful search by Deputy Thomas.  While one would think that discovery in such a matter would be relatively simple, Plaintiffs have engaged in an inordinate and burdensome amount of discovery, resulting in a waste of time as well as resources of both the STPSO and the taxpayers of St. Tammany Parish.  For example, during the discovery process, Plaintiffs, along with issuing interrogatories and requests for

---

plaintiffs in response to their pre-suit public records requests.  Defendants would thus suggest that the Daily Observation Report issue is nothing more than a fictional dispute in order to give the Plaintiffs an excuse to seek to amend their lawsuit and delay the trial.

[47] *See* R. Doc. 97, pg. 2, footnote 4; *See also* R. Doc. 97, pg. 9.
[48] *See* Exhibit C to Plaintiffs' Reply Memorandum, R. Doc. 97-3.

production,[49] have issued a total of two hundred eighty-three (283) Requests for Admission to Defendants, to which Defendants provided responses.[50]  Plaintiffs have also taken a total of eight (8) depositions, lasting a total of **26 hours and 44 minutes**[51] and constituting **1,281 pages of deposition testimony**, with plans to take two (2) additional depositions, despite this matter involving only three (3) STPSO deputies and only one (1) single remaining claim.

### ii.    Knowingly Taking Hours of Irrelevant Deposition Testimony

As previously noted, prior to taking the deposition of a single individual in this matter, the District Court had already dismissed all of Plaintiffs' claims with prejudice, except for Plaintiff Washington's single claim for an alleged unlawful search by Defendant, Deputy Thomas, and Plaintiffs' claims against the unknown, unserved "Doe" Defendants.[52]  Despite the dismissal of almost all of Plaintiffs' claims, Plaintiffs' counsel has conducted a total of a total of **eight (8) depositions**, with plans to take two additional depositions in the near future.[53]  As provided below, each of these depositions, taken by Plaintiffs' counsel, have lasted for hours:

| | |
|---|---|
| 11/14/22 Deposition of Alexander Thomas | 5hr 4min (9:51 AM – 2:55 PM) |
| 11/14/22 Deposition of Shaun Wood | 2hr 20 min (3:00 PM – 5:20 PM) |
| 11/15/22 Deposition of Emile Lubrano | 2hr 35min (9:40 AM – 12:15 PM) |
| 11/16/22 Deposition of Dale Galloway | 4hr 9min (2:37 PM – 6:46 PM) |

---

[49] Defendants have produced over 660 pages of documents to Plaintiffs thus far, including body camera footage. Plaintiffs additionally received over 130 documents from the STPSO prior to the filing of suit in this matter through the use of public records requests.

[50] *See* Defendant, Randy Smith's, Responses to Plaintiffs' First Set of Requests for Admission, attached herein as Exhibit "19"; *See* Defendants, Alexander Thomas, Shaun Wood and Jackson Bridel's, Responses to Plaintiffs' First Set of Requests for Admission, attached herein as Exhibit "20".

[51] As previously noted, Defendants are still awaiting the final copy of the deposition testimony of Defendants' expert, John Ryan.  Accordingly, Defendants have not included the amount of time over which this deposition was taken in the total.

[52] *See* R. Doc. 61, pgs. 50-51.

[53] The deposition of John Evans was scheduled to be taken on December 2, 2022, but was canceled at the request of Plaintiffs' counsel, due to one (1) of Plaintiffs' eight (8) attorneys enrolled in this matter having a 'personal emergency.'  Additionally, a Motion for Protective Order regarding the 30(b)(6) deposition of the STPSO is currently pending in this matter.  (*See* R. Doc. 73).

| | |
|---|---|
| 11/17/22 Deposition of Jeremy Travis | 4hr 19min (9:30 AM – 1:49 PM) |
| 11/18/22 Deposition of Jackson Bridel | 4hr 2min (9:30 AM – 1:32 PM)[54] |
| 11/28/22 Deposition of John Ryan | (9:30 AM – ?:??)[55] |
| 12/02/22 Deposition of Christopher Graham | 4hr 15min (2:30 PM – 6:45 PM) |
| **Total Time of Depositions:** | **26 hours 44 minutes**[56] |

As provided above, Plaintiffs have conducted **eight (8) depositions**, totaling **over 26 ½ hours of deposition testimony**.[57]  Plaintiffs' counsel chose to conduct these eight (8) depositions despite the fact that only three (3) of these depositions (Thomas, Wood, Bridel) involve Defendants that have anything to do with Plaintiff Washington's single remaining claim for unlawful search. Plaintiffs' counsel made the decision to move forward with taking these irrelevant depositions of these individuals, despite being advised by their own clients,[58] as well as undersigned counsel, that these individuals never spoke with Plaintiffs or had no recollection of speaking with Plaintiffs.[59] Additionally, on November 2, 2022, undersigned counsel advised Plaintiffs' counsel that John Evans was the only individual who recalled speaking with Plaintiffs.[60]  For reasons unknown, however, Plaintiffs' counsel made the conscious decision to waste over **fifteen (15) hours** deposing Emile Lubrano (2hr 35min), Dale Galloway (4hr 9min), Jeremy Travis (4hr 19min) and Christopher Graham (4hr 15min), even after these individuals repeatedly testified that they had either **never** spoken to Plaintiffs, **had no recollection** of speaking with Plaintiffs and have **no idea**

---

[54] The Deposition of Deputy Bridel was set to begin at 9:30 AM, however, it was delayed due to Plaintiffs' counsel having issues finding a court reporter. (*See* Exhibit 2, pg. 5.)

[55] As previously noted, Defendants are still awaiting the final copy of the deposition testimony of Defendants' expert, John Ryan.  Accordingly, Defendants have not included the amount of time over which this deposition was taken in the total.

[56] *Id*. at footnote no. 55.

[57] *Id*. at footnote no. 55.

[58] *See* Exhibit 8, pgs. 86-90, 100; *See also* Exhibit 8-A; *See also* Exhibit 9, pgs. 61-62; *See also* Exhibit 9-A.

[59] *See* Exhibit 15; *See* Exhibit 16; *See also* Email correspondence to Plaintiffs' counsel dated November 4, 2022, attached herein as Exhibit "21".

[60] *See* Email correspondence to Plaintiffs' counsel dated November 2, 2022, attached herein as Exhibit "22".

who the Plaintiff(s) even are.[61]  Plaintiffs' counsel, instead, decided to use these depositions as an opportunity to harass the deponents, engaging in lengthy lines of questioning having absolutely no relevance whatsoever to the matters at issue.

Plaintiffs' actions became abundantly clear during the recent deposition testimony of Christopher Graham, which took place on December 2, 2022.  Despite being previously informed that Sgt. Graham had **no memory of speaking with either plaintiff**,[62] and despite Sgt. Graham testifying that he **never spoke with either plaintiff**,[63] counsel for Plaintiffs decided to depose Sgt. Graham for **4 hours 15 minutes**.  Defendants suggest that such conduct is far beyond the intent of good faith discovery under FRCP Rule 30 and constitutes nothing more than harassment.

It should therefore be no surprise to this Honorable Court that Counsel for Plaintiffs' decision to knowingly waste hours and hours taking irrelevant deposition testimony purely for the purposes of harassing the deponents, has come at great expense to the STPSO and ultimately the taxpayers of St. Tammany Parish and Defendants would urge that the Court consider possible sanctions for this conduct.

### iii. Plaintiffs' Failure to obtain the Defendants' consent or a court order prior to conducting remote depositions

Federal Rule of Civil Procedure Rule 30(b)(4) provides as follows:

> "By Remote Means. The parties may stipulate—or the court may on motion order—that a deposition be taken by telephone or other remote means. For the purpose of this rule and Rules 28(a), 37(a)(2), and 37(b)(1), the deposition takes place where the deponent answers the questions."

As provided above, Rule 30(b)(4) requires that the parties either stipulate that a deposition be taken by remote means, or that the party seeking to take the deposition by remote means obtain

---

[61] *See* Exhibit 3, pgs. 28-29, 48, 81-83, 96-97; *See* Exhibit 5, pgs. 32, 131-132; *See* Exhibit 6 pg. 142-144; *See* Exhibit 7, pgs. 64-66, 80, 90-91, 108.
[62] *See* Exhibit 21.
[63] *See* Exhibit 7, pgs. 64-66, 80, 90-91, 108.

a court order.  Plaintiffs, however, have failed to obtain either the consent of the Defendants or a court order allowing such remote depositions to take place.  On multiple occasions throughout the course of these depositions, undersigned counsel made the Defendants' objections clear, in that prior to the taking of many of these depositions, that there was no agreement between the parties that these depositions would be taken remotely.[64]  Accordingly, the depositions of Jackson Bridel, Emile Lubrano, Jeremy Travis and Christopher Graham were improperly noticed and taken, as Plaintiffs failed to obtain the necessary consent and/or court order in accordance with Rule 30(b)(4) of the Federal Rules of Civil Procedure.

### iv.     Use of the Discovery Process to Train young Associates and Law Clerks

Not only have Plaintiffs wasted hours upon hours deposing numerous individuals who have absolutely no information relevant to Plaintiff Washington's remaining claim for unlawful search, and spent much of that time inquiring as to issues completely irrelevant to that matter, such as the consent decree between the NOPD and the DOJ,[65] Plaintiffs also seem to have been using the discovery process as a means to train their young associates and law clerks on the process of conducting a deposition.  Throughout the course of the numerous depositions taken in this matter, Plaintiffs have had as many as nine (9) attorneys, law clerks, and up to a total of twelve (12) individuals associated with Plaintiffs' counsel making appearances during a single deposition.[66] The sheer number of people attending these depositions on behalf of Plaintiffs has led Plaintiffs to

---

[64] *See* Exhibit 2, pgs. 5-6; *See* Exhibit 3, pg. 5; *See* Exhibit 6, pgs. 1-3; *See* Exhibit 7, pg. 6.

[65] *See* Exhibit 4, pgs. 21-22.

[66] *See* Exhibit 1, pgs. 2-3, wherein 7 attorneys made appearances on behalf of Plaintiffs; *See* Exhibit 2, pg. 2, wherein 11 individuals made appearances on behalf of Plaintiffs, including 7 attorneys; *See* Exhibit 3, pg. 3, wherein 8 individuals made appearances on behalf of Plaintiffs, including 6 attorneys; *See* Exhibit 4, pgs. 2-3, wherein 11 individuals made appearances on behalf of Plaintiffs, including 7 attorneys; *See* Exhibit 5, pg. 2, wherein 12 individuals made appearances on behalf of Plaintiffs, including 8 attorneys; *See* Exhibit 7, pg. 3, wherein 6 individuals made appearances on behalf of Plaintiffs, including 3 attorneys; *See* Exhibit 8, pg. 2, wherein 10 individuals made appearances on behalf of Plaintiffs, including 8 attorneys; *See* Exhibit 9, pg. 2, wherein 11 individuals made appearances on behalf of Plaintiffs, including 9 attorneys.

further abuse the discovery process, allowing Plaintiffs to continually request to take an inordinate number of breaks throughout the course of every deposition, in order for Plaintiffs' counsel to confer with one another regarding the next line of questioning. Counsel for Plaintiffs' constant abuse of the discovery process, in continually requesting to take these numerous unnecessary breaks not only shows a lack of preparedness on the part of Plaintiffs' counsel, but further prolongs what have been extraordinarily long depositions in this matter.[67]

### 5. Virtue Signaling

Throughout the course of this litigation, it has become clear to undersigned counsel that this entire litigation is a misuse of the judicial process and is nothing more than an orchestrated example of virtue signaling, spawned by the ACLU of Louisiana's call to focus "***intensive efforts on a single state***"[68] in order to establish a "***litigation blueprint for altering police conduct across the country***."[69] The ACLU of Louisiana announced that they hoped to change the narrative of policing through the "ACLU of Louisiana's Justice Lab: Putting Racist Policing on Trial."[70] The ACLU of Louisiana describes the Justice Lab: Putting Racist Policing on Trial as "…an intensive litigation and storytelling effort to challenge racially discriminatory policing practices and combat police violence against people of color."[71]

Justice Lab: Putting Racist Policing on Trial lists its Mission and Vision as follows:

---

[67] Defendants note that the depositions of Plaintiffs, Bruce Washington and Gregory Lane, were noticed to take place on October 26, 2022, at 9:30 AM and 2:30 PM, respectively. Despite being noticed for 9:30 AM, the deposition of Plaintiff, Bruce Washington, did not being until 10:20 AM, due to Mr. Washington's failure to arrive on time. (*See* Exhibit 8, pg. 6). At 11:49 AM, at the request of Plaintiffs' counsel, despite undersigned counsel stating that he was almost finished deposing Mr. Washington, a break was taken until 11:57 AM. (*See* Exhibit 8, pgs. 96-97). Eight (8) minutes later, at 12:05 PM, after undersigned counsel informed Mr. Washington that he was finished with his questioning, Plaintiffs' counsel requested another ten (10) minute break. (*See* Exhibit 8, pg. 102). This ten (10) minute break, however, lasted twenty-nine (29) minutes. (*See* Exhibit 8, pg. 102). Undersigned counsel, noting the length of the break and the fact that both Mr. Washington and his counsel left the room together for the entire period of time, stated on the record that he was reserving his right to seek relief from the Court. (*See* Exhibit 8, pg. 103).
[68] *See* ACLU of Louisiana Press Release dated July 21, 2020, titled "*ACLU of Louisiana Seeking Plaintiffs to Challenge Racist Policing Practices in Louisiana*", attached herein as Exhibit "23".
[69] *See* Exhibit 23.
[70] *See* Exhibit 23; *See also* "*Program Overview*", attached herein as Exhibit "24".
[71] *See* Exhibit 23; *See also* Exhibit 24.

"OUR MISSION:

Through direct legal representation and community advocacy, Justice Lab aims to create a partnership among directly-impacted people, communities, private law firms, and legal clinics to challenge racially discriminatory policing practices in Louisiana. The initiative seeks to empower directly-impacted families and communities in taking on this fight.

OUR VISION:

As one of a host of solutions for ending police violence against people of color and reimagining the role of policing in our communities, Justice Lab aims to hold law enforcement accountable for racist policing practices and establish a litigation blueprint for combatting police abuses across the country. We envision a world where police are no longer immune from accountability and where no child has to grow up in fear of being targeted by the police."[72]

Furthermore, shortly after filing suit in this matter, counsel for Plaintiffs published an article titled "*Linklaters teams up with ACLU of Louisiana in lawsuit against unconstitutional policing - Filed on behalf of two men racially profiled by the St. Tammany Parish Sheriff's Office*."[73]  In this article, Adam Lurie, Head of Linklaters' U.S. Dispute Resolution practice, stated:

"We are proud to support the ACLU's Justice Lab in this important pro bono matter and in its continued fight against the daily injustices people of color face in this country. Unconstitutional policing and racial profiling are wrong, dehumanizing, and harmful to our democracy."[74]

Nora Ahmed, ACLU of Louisiana's Legal Director, as well as counsel for Plaintiffs in this matter, further provided that:

"This case demonstrates a continued prevalence of what appears to be nothing more than a pattern of racial profiling in Louisiana. Our clients were stopped in a predominantly white area by officers from an agency that has a documented track record of targeting Black people. This is a textbook case of why people took to the streets in 2020 and why, sadly, this nation and

---

[72] *See* Mission and Vision of the ACLU of Louisiana's Justice Lab, attached herein as Exhibit "25".
[73] *See "Linklaters teams up with ACLU of Louisiana in lawsuit against unconstitutional policing - Filed on behalf of two men racially profiled by the St. Tammany Parish Sheriff's Office,*" attached herein as Exhibit "26".
[74] *See* Exhibit 26.

our state still have so far to go."[75]

As provided by the publications and statements issued by the ACLU of Louisiana and Plaintiffs' counsel both before and after the inception of this suit, it is abundantly clear that the entire impetus behind this **frivolous lawsuit** is to somehow "…establish a ***litigation blueprint for altering police conduct across the country***."[76]   There is simply no other rationale or explanation for the actions of Plaintiffs' counsel throughout the course of this litigation, including counsels' overly broad and irrelevant line of questioning during depositions,[77] deposing multiple individuals who are completely irrelevant to Plaintiffs Washington's remaining cause of action for unlawful search,[78] and Plaintiffs' claims of alleged racial prejudice, discrimination and bias contained within the Second Amended Complaint,[79] which Plaintiffs have testified that they never read,[80] and further admit that they have zero evidence to support.[81]

### 6. Plaintiffs' failure to address supposed discovery issues

Plaintiffs contend that there have been numerous issues with regard to discovery in this matter, and that Defendants have acted in bad faith throughout the entirety of the discovery process. In this regard, Defendants first note that any and all issues with discovery that Plaintiffs are now asserting for the first time, should have been addressed at some point prior to Plaintiffs' Motion for Leave to File TAC, and further, Plaintiffs' counsel should have actively pursued their clients' claims, instead of waiting five (5) months to begin conducting discovery and wasting time by engaging in constant motion practice seeking to delay and extend all deadlines.[82]

---

[75] *Id.*
[76] *See* Exhibit 23.
[77] *See* Exhibit 1; *See* Exhibit 2; *See* Exhibit 3; *See* Exhibit 4; *See* Exhibit 5; *See* Exhibit 6; *See* Exhibit 7; *See* Exhibit 10.
[78] *See* Exhibit 3; *See* Exhibit 5; *See* Exhibit 6; *See* Exhibit 7.
[79] *See* R. Doc. 29.
[80] *See* Exhibit 8, pgs. 61-62; *See also* Exhibit 9, pgs. 49-50.
[81] *See* Exhibit 8, pgs. 50, 63-64; *See also* Exhibit 9, pgs. 49-51.
[82] On December 1, 2022, Plaintiffs filed their most recent request for an extension in this matter, filing their *Motion*

Additionally, Defendants note that at no time throughout the entirety of this litigation have Plaintiffs ever sought any redress with the Court for what Plaintiffs now allege to be 'substantial' issues with regard to Defendants' discovery responses.  Plaintiffs never sought an order compelling anything in discovery, nor have Plaintiffs sought to have the Court address any of the issues and alleged obstruction by the Defendants, which they now allege for the first time within their Reply Memorandum.  Indeed, the only discovery motion filed in these entire proceedings was the Defendants' Motion for Protective Order (R.Doc. 73), which Defendants were compelled to file due to Plaintiffs' seeking a 30(b)(6) deposition of the St. Tammany Parish Sheriff's Office on a whole host of irrelevant issues, including their desire that the Sheriff produce a witness to discuss litigation involving the St. Tammany Parish Jail that was dismissed over twenty years ago.

Defendants would therefore suggest that Plaintiffs' actions are obvious, as they are nothing more than yet another delay tactic with which Plaintiffs hope to continue to prolong their meritless and frivolous lawsuit.  Defendants respectfully suggest that Plaintiffs should not be allowed to cause further delays in this matter by allowing the Plaintiffs to file their untimely TAC.

## <u>CONCLUSION</u>

For the reasons expressed above, Defendants respectfully request that this Honorable Court issue an Order denying Plaintiffs' Motion for Leave to File Third Amended Complaint.

---

*to Continue Submission Date on Defendants' Motion for Summary Judgment* (*See* R. Doc. 94).

Respectfully submitted,

**MILLING BENSON WOODWARD L.L.P.**


*s/ Chadwick W. Collings*
**CHADWICK W. COLLINGS, T.A.**            # 25373
**68031 Capital Trace Row**
**Mandeville, LA 70471**
**Telephone:   (985) 292-2000**
**Facsimile:    (985) 292-2001**
**Email:         ccollings@millinglaw.com**
*Counsel for Defendants*


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was electronically filed with the Clerk of

Court of the United States District Court for the Eastern District of Louisiana on Thursday,

December 08, 2022, by using the CM/ECF system, which system will send a notice of electronic

filing to appearing parties in accordance with the procedures established.


*s/ Chadwick W. Collings*
**Chadwick W. Collings**